UNITED CARBON COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 46499. Promulgated July 23, 1935.

*Robert A. Littleton, Esq., W. W. Spalding, Esq.,* and *James A. Councilor, C. P. A.,* for the petitioner.

*Bruce A. Low, Esq., T. G. Histon, Esq.,* and *L. H. Rushbrook, Esq.,* for the respondent.

OPINION.

TRAMMELL: This proceeding is for the redetermination of a deficiency in income tax of $15,848.57 for the period February 14 to December 31, 1925. Issues raised by the pleadings and not conceded by the respondent are whether the respondent erred (1) in determining that the basis for computing depreciation and depletion with respect to certain exhaustible assets acquired by the petitioner in exchange for its capital stock was the cost of such assets in the hands of the transferors, (2) in failing to allow a deduction of $20,000 as an expense for services of accountants, and (3) in failing to allow a

deduction of $16,636.47 as expenses incurred for a number of items including amounts paid to states other than that in which the petitioner was organized for the privilege of carrying on business in such states, for numbering stock certificates, and for "transfer services." The proceeding was submitted upon oral and documentary evidence and a stipulation of facts, the latter of which is incorporated herein by reference.

### Basis for Computing Depreciation and Depletion.

The petitioner is a Delaware corporation, organized on or about February 19, 1925, and having its principal place of business at Charleston, West Virginia. It is engaged in the business of manufacturing carbon black and gasoline.

Sometime prior to February 14, 1925, Oscar Nelson, who was president of the Cosmos Carbon Co., a corporation engaged in the manufacture of carbon black, discussed with G. A. Williams, who was general manager of the Liberty Carbon Co. and the Louisiana Carbon Co., corporations also engaged in the manufacture of carbon black, the idea of bringing together in one organization the assets of various corporations engaged in the manufacture of carbon black. Nelson asked Williams to discuss the idea with the officers of the corporations with which he (Williams) was associated and it was agreed that Nelson would approach the officers of one or two other corporations. Thereafter a meeting was held in Pittsburgh, at which four corporations were represented, and as a result of the meeting it was agreed that certain appraisals would be made. Following this Nelson called Williams into a conference with himself and A. B. Koontz, who was secretary of the Natural Gas Products Co., a corporation also engaged in the manufacture of carbon black, at which a discussion was had as to the purchase of carbon plants. The three proceeded from Charleston, West Virginia, to Monroe, Louisiana, and there interviewed the officers of the various corporations whose assets they desired to purchase. After spending some time in Monroe they proceeded to points in Texas where officers of certain of the corporations lived and interviewed them.

During the trip Nelson and Williams visited the various plants which they wished to acquire and examined the physical properties thereof. After examining the properties and approximating the inventories of the various corporations and considering appraisals which had been made recently by an appraisal company, they entered into negotiations with the corporations for the acquisition of their properties, the negotiations being conducted separately and independ-

ently with each corporation and none of the corporations being informed as to the price that was to be given for the properties of any other corporation. The amount of consideration to be offered the various corporations for their properties was arrived at by using the appraisals and the information acquired by Nelson and Williams during their examinations of such properties.

The properties of the various corporations that Nelson, Williams, and Koontz were interested in acquiring consisted of buildings for the burning of carbon black, leaseholds, plant sites, and other appurtenances that go with the business of manufacturing carbon black. Their object in acquiring such properties was to secure the elimination of competition, to have a sufficient amount of carbon black to maintain a sales organization of their own, and to be independent of the way that they had had to do business theretofore, viz., " a lot of separate units competing for business and none of them getting very much."

Later another meeting was held, which representatives of more than twenty corporations attended, but not all of the corporations represented participated in the transactions which were to follow.

The petitioner was organized with a total authorized capital stock of $10,000,000, 7 percent noncumulative preferred stock, divided into 100,000 shares of a par value of $100 per share and redeemable at the option of the petitioner at $110 per share, and 400,000 shares of common stock without nominal or par value.

Prior to the organization of the petitioner Nelson, Koontz, Williams, and C. A. Barbour, acting for and on behalf of the proposed incorporators of the petitioner, had, during the period January 13 to February 17, 1925, submitted offers to certain corporations and a partnership for the purchase by the petitioner, when organized, of their inventories of carbon black, gasoline, crude oil and manufacturing supplies, and certain of their other assets used in connection with the manufacture of carbon black, such as real estate, manufacturing plants, plant sites, warehouses, equipment contracts, leases, etc. These offers provided that the inventories were to be paid for in cash. With respect to the other assets they provided for payment to be made in shares of the preferred stock of the petitioner and voting trustees certificates representing shares of common stock of the petitioner, both in certain stated amounts. These offers specifically excepted corporate franchises, cash on hand, and bills and notes receivable. The offers also provided that the assets to be acquired for stock and voting trustees certificates were to be free from all liens and encumbrances, that the corporation or partnership to which the offer was made would join in a voting trust agreement

covering the voting of the stock of the petitioner for a period of five years, and that if the offer was accepted it would be effective as of February 14, 1925.

By February 17, 1925, the partnership and 12 corporations, one of which was also the assignee of the assets of a thirteenth corporation, had accepted in whole or in part the offers made in behalf of the proposed incorporators of the petitioner. At a meeting of the board of directors of the petitioner held on February 21, 1925, the offers made for and on behalf of the proposed incorporators of the petitioner were approved and ratified. In order to provide funds with which to make payment for the inventories of the partnership and the various corporations and to provide working capital the directors of the petitioner at a meeting held on February 23, 1925, authorized the issuance by the petitioner of not to exceed $2,500,000 of 7 percent 6 year bonds.

Pursuant to the action of ratification of the petitioner's directors on February 21, 1925, the petitioner acquired from the partnership and the corporations shown below inventories and other assets of the fair market values indicated, cash being paid for the inventories in the amount of their fair market value and stock being issued for the other assets as indicated. Included in the item of other property are properties of a depletable nature and of a depreciable nature, as well as those of a nondepletable nature and those of a nondepreciable nature.

| | Fair market value of inventory for which cash in a like amount was paid | Fair market value of other assets for which stock was issued | Stock issued for other assets | |
| --- | --- | --- | --- | --- |
| | | | Preferred ($100 par value) | Common (no par value) |
| | | | *Shares* | *Shares* |
| Consolidated Carbon Co | $361,822.23 | $1,091,110.73 | 5,345 | 21,380 |
| Standard Carbon Co | 124,163.76 | 1,369,672.63 | 6,000 | 24,000 |
| United Oil & Natural Gas Products Corporation | 306,274.76 | 1,241,857.06 | 5,900 | 23,600 |
| Central Carbon Co | 154,766.58 | 717,120.94 | 3,836 | 15,344 |
| Pelican Carbon Co | 18,033.36 | 474,535.90 | 1,637 | 6,550 |
| Louisiana Gas Products Corporation | 60,970.55 | 393,828.47 | 1,945 | 7,780 |
| Liberty Carbon Co | 79,539.43 | 256,293.92 | 1,506 | 6,024 |
| Louisiana Carbon Co | 152,530.92 | 370,754.91 | 1,825 | 7,300 |
| Green River Carbon Co. (partnership) | 12,494.73 | 54,725.07 | 250 | 1,000 |
| Cosmos Carbon Co | 263,312.77 | 1,936,782.56 | 8,990 | 35,960 |
| Cumberland Carbon Co | 3,418.18 | 51,527.50 | 250 | 1,000 |
| Natural Gas Products Corporation | 122,450.32 | 529,169.23 | 2,645 | 10,580 |
| Humphreys Carbon Co | 90,933.88 | 1,109,925.86 | 6,000 | 24,000 |
| Tampico Gas Co | | 335,899.34 | 2,000 | 6,000 |
| Total | $1,755,711.47 | $9,933,204.12 | 48,129 | 190,518 |

There is shown below the cost to the partnership and each of the corporations of all assets, exclusive of inventory, owned at the time of the acquisition by the petitioner of assets from them, the cost to each of the assets, exclusive of inventory, acquired by the petitioner from each, the cost to each of assets retained by it, the percentage of assets

of each, other than inventory, that were transferred and the percentage of assets retained:

| | Cost of all assets, exclusive of inventory | Cost of assets transferred to petitioner, exclusive of inventory | Cost of assets retained | Percentage of assets, exclusive of inventory, transferred to petitioner | Percentage of assets retained |
|---|---|---|---|---|---|
| Consolidated Carbon Co | $1,639,738.06 | $713,599.86 | $926,138.20 | 43.5191 | 56.4809 |
| Standard Carbon Co | 1,564,356.69 | 1,481,968.98 | 82,387.71 | 94.7334 | 5.2666 |
| United Oil & Natural Gas Products Corporation | 5,780,286.95 | 978,332.83 | 4,801,954.12 | 16.9253 | 83.0747 |
| Central Carbon Co | 635,786.57 | 606,007.87 | 29,778.70 | 95.3162 | 4.6838 |
| Pelican Carbon Co | 554,869.40 | 517,544.12 | 37,325.28 | 93.2731 | 6.7269 |
| Louisiana Gas Products Corporation | 591,068.15 | 385,013.95 | 206,054.20 | 65.1386 | 34.8614 |
| Liberty Carbon Co | 239,333.97 | 213,856.02 | 25,477.95 | 89.3546 | 10.6454 |
| Louisiana Carbon Co | 269,689.96 | 261,170.50 | 8,519.46 | 96.8410 | 3.1590 |
| Green River Carbon Co. (partnership) | 43,805.01 | 37,755.19 | 6,049.82 | 86.1892 | 13.8108 |
| Cosmos Carbon Co | 1,036,946.20 | 802,002.05 | 234,944.15 | 77.3426 | 22.6574 |
| Cumberland Carbon Co | 20,000.00 | 20,000.00 | | 100.0000 | |
| Natural Gas Products Corporation | 436,919.63 | 277,027.63 | 159,892.00 | 63.4047 | 36.5953 |
| Humphreys Carbon Co | 1,126,626.05 | 1,076,758.55 | 49,867.50 | 95.5737 | 4.4263 |
| Tampico Gas Co | 645,596.84 | 487,825.90 | 157,770.94 | 75.5620 | 24.4380 |

The assets shown above as having been acquired from the Cumberland Carbon Co. were acquired through the Cosmos Carbon Co., which was the assignee of the assets of Cumberland Carbon Co. The directors of the Humphreys Carbon Co. had taken steps looking toward the dissolution of that corporation prior to the time an offer was made to the corporation on behalf of the proposed incorporators of the petitioner for the acquisition of some of its assets.

In its income tax return for the taxable year in controversy the petitioner took depreciation deductions on the depreciable assets acquired by it from the partnership and the corporations shown above for stock on the basis of values placed thereon in a revaluation of such assets. In determining the deficiency here involved the respondent determined that the depreciation allowable on such assets, with the exception of those acquired from the Tampico Gas Co., should be computed on the basis of the cost to the transferors. In the case of the depreciable assets acquired by the petitioner from the Tampico Gas Co. the respondent determined that the basis for computing depreciation was the value of the stock issued by the petitioner therefor.

In its return for the taxable year here involved the petitioner took depletion deductions on the depletable assets acquired for stock on the basis of values placed thereon in a revaluation of such assets. In determining the deficiency the respondent determined the depletion allowances on the percentage of income method provided in section 204 (c) (2) of the Revenue Act of 1926, based on estimated income.

There is no controversy between the parties as to the inventories which the petitioner acquired from the partnership and the various corporations for cash and as a result of a purchase and sale. The

controversy relates to the assets acquired by the petitioner in exchange for its stock. The petitioner contends that the basis for determining depreciation and depletion allowances with respect to assets subject to such allowances is the fair market value of such assets at the time of acquisition. The respondent on the other hand contends that the basis for determining such allowances is the basis in the hands of the transferors.

Pertinent portions of the Revenue Act of 1926, which is applicable to the year in controversy, are as follows:

SEC. 204. (c) The basis upon which depletion, exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the same as is provided in subdivision (a) * * * for the purpose of determining the gain or loss upon the sale or other disposition of such property * * *.

SEC. 204. (a) The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property; except that—

\* \* \* \* \* \* \*

(8) If the property (other than stock or securities in a corporation a party to a reorganization) was acquired after December 31, 1920, by a corporation by the issuance of its stock or securities in connection with a transaction described in paragraph (4) of subdivision (b) of section 203 (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money in addition to such stock or securities), then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made.

SEC. 203. (b) (4) No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.

SEC. 203. (i) As used in this section the term " control " means ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

The evidence shows that the transferors of assets to the petitioner for stock were in " control " of petitioner after the transfers within the meaning of that term as used in the statute, and the petitioner makes no contention that they were not. The fact that the assets in controversy were owned separately by the various transferors prior to the time of acquisition by the petitioner does not of itself take the transactions by which they were acquired by the petitioner out of the application of the provisions of section 203 (b). *Ared Corporation*, 30 B. T. A. 1080; *American Compress & Warehouse Co.* v. *Bender*, 70 Fed. (2d) 655; certiorari denied, 293 U. S. 607.

The petitioner contends, however, that the provisions of section 203 are inapplicable, on the ground that the amount of the stock received

by each of the transferors for assets transferred is not substantially in proportion to their respective interests in the assets prior to the exchange.

There is shown below for each transferor the percentage of the total market value of the assets transferred, exclusive of inventory, the percentage of the total shares of stock of each class that was received for assets transferred and the variation or difference between the percentage of total assets transferred and the percentage of each class of stock received.

| Name of transferor | Percentage of total assets transferred exclusive of inventory | Percentage of total shares of preferred stock received | Percentage of total shares of common stock received | Difference between percentage of assets transferred and percentage of preferred stock received | Difference between percentage of assets transferred and percentage of common stock received |
|---|---|---|---|---|---|
| Consolidated Carbon Co | 10.9844 | 11.1055 | 11.2220 | +.1211 | +.2376 |
| Standard Carbon Co | 13.7888 | 12.4664 | 12.5972 | −1.3224 | −1.1916 |
| United Oil & Natural Gas Products Corporation | 12.5020 | 12.2587 | 12.3872 | −.2433 | −.1148 |
| Central Carbon Co | 7.2194 | 7.9702 | 8.0538 | +.7508 | +.8344 |
| Pelican Carbon Co | 4.7772 | 3.4012 | 3.4379 | −1.3760 | −1.3393 |
| Louisiana Gas Products Corporation | 3.9647 | 4.0412 | 4.0836 | +.0765 | +.1189 |
| Liberty Carbon Co | 2.5801 | 3.1290 | 3.1619 | +.5489 | +.5818 |
| Louisiana Carbon Co | 3.7324 | 3.7918 | 3.8316 | +.0594 | +.0992 |
| Green River Carbon Co. (partnership) | .5509 | .5194 | .5248 | −.0315 | −.0261 |
| Cosmos Carbon Co | 19.4980 | 18.6789 | 18.8748 | −.8191 | −.6232 |
| Cumberland Carbon Co | .5187 | .5794 | .5248 | +.0607 | +.0061 |
| Natural Gas Products Corporation | 5.3272 | 5.4956 | 5.5532 | +.1684 | +.2260 |
| Humphreys Carbon Co | 11.1738 | 12.4664 | 12.5972 | +1.2926 | +1.4234 |
| Tampico Gas Co | 3.3815 | 4.1554 | 3.1493 | +.7739 | −.2322 |
| Total | 100.00 | 100.00 | 100.00 | -------- | -------- |

In *Ared Corporation, supra*, we held that a variation of 1.73 percent between the amount of stock received and the interest in assets transferred did not require a holding that the amount of stock received was not substantially in proportion to the interest in the property prior to the transfer. In that case only two transferors were involved and the combined range of variation was 3.46 percent. In the instant case the greatest range of variation is between the Pelican Carbon Co. and the Humphreys Carbon Co. The Pelican Carbon Co. transferred to the petitioner 4.7772 percent of the total assets transferred by all the transferors and received 3.4012 percent of the preferred stock and 3.4379 percent of the common stock issued by the petitioner for assets. The percentage of preferred stock received by this transferor was 1.3760 less than the percentage of assets transferred and the percentage of common stock was 1.3393 less than the percentage of such assets. The Humphreys Carbon Co. transferred to the petitioner 11.1738 percent of the total assets transferred by all the transferors and received 12.4664 percent of the preferred stock and 12.5972 percent of the common stock issued by the petitioner for assets. The percentage of preferred stock received by this trans-

feror was 1.2926 more than the percentage of assets transferred and the percentage of common stock was 1.4234 more than the percentage of such assets. The greatest variation with respect to preferred stock therefore was 2.6686 and that with respect to common stock was 2.7627. If the extreme of 1.3760 with respect to the preferred stock received by the Pelican Carbon Co. is combined with the extreme of 1.4234 with respect to the common stock received by the Humphreys Carbon Co. the combined range of variation is only 2.7994. The extreme variations as well as the combined range of variation are well within those held to be substantially in proportion to the interest in the property prior to the transfer in *Ared Corporation, supra.* In view of our holding in that case we think that in the instant case the stock received by the transferors for assets was substantially in proportion to their respective interests in the assets prior to the transfer to the petitioner.

The petitioner urges that due to the variation between the percentage of the value of the assets transferred by each of the transferors and the percentages of stock received by each there resulted material disproportions between the value of the assets owned by the separate transferors prior to the transfer and the value of their respective beneficial interests in the combined assets after the transfer. It insists that the provision of section 203 (b) limiting its application to those cases in which " the amount of the stock  *  *  * received by each is substantially in proportion to his interest in the property prior to the exchange " requires not only that the amount of stock received by each of the transferors shall be substantially in proportion to his respective interest in the property prior to the exchange, but that in addition there shall be no substantial change in the continuity of the amount of the value of the interest in property transferred by each. In other words the petitioner contends that, where there are transfers by a number of persons of separately owned assets of varying amounts for stock and because of slight variations between the value of assets transferred by some and the amount of stock received by them the others acquire beneficial interests in the combined assets substantially greater or less in value than the interest in the assets they had transferred, there develops a situation which would take the case out of the application of the statute.

The theory advanced by the petitioner as to a continuity of substantially the same value of interest in assets proceeds a step further than is provided by the statute. The petitioner not only cites us to no case in which the decision was predicated on the theory advanced by it, but urges that our decision in *Ared Corporation, supra,* when considered in the light of this theory, is erroneous. Our decision in that case was based on the rule expressly provided by the

statute and we think it is sound. Since the statute has provided a clear rule to be followed, we would not be warranted in attempting to read into it a requirement not contained in it.

We think the instant case comes within the provisions of section 203 (b) (4) and section 204 (a) (8) of the act, and so hold.

In determining the deficiency the respondent allowed a different basis to the petitioner with respect to depreciable assets acquired from the Tampico Gas Co. However, at the hearing he moved for an increase in the deficiency resulting from a change in depreciation rates as stipulated by the parties in event that we should hold that the basis for depreciation is that in the hands of the transferors. Since we find nothing in the record to warrant the depreciable assets transferred by the Tampico Gas Co. being accorded a basis for depreciation other than they would have if in the hands of that company, we hold that such basis is to be used in computing depreciation on those assets.

In making his determination the respondent apparently concluded that the acquisition of assets by the petitioner in exchange for stock was a transaction coming within the provisions of section 203 (b) (4); and this was his contention at the hearing. In his brief he states that he does not think those provisions are controlling and urges that the transaction was a reorganization within the meaning of the provisions of section 203 (h) (1) (A) and (B). Inasmuch as we have found that the transaction comes within the provisions of section 203 (b) (4) and section 204 (a) (8), it becomes unnecessary to determine whether it also comes within the provisions of section 203 (h) (1) (A) and (B).

In their stipulation the parties have submitted the data requisite for a recomputation on the basis the assets would have if in the hands of the transferors of the depletion and depreciation allowances on the various items of the different classes of assets subject to such allowances. In the recomputation of the deficiency to be submitted by the parties under Rule 50 effect will be given to their stipulation.

### Expenditures for Services of Accountants.

In 1925 the petitioner paid a firm of accountants $20,000 for services. The services consisted of identifying as of February 14, 1925, the inventories acquired by the petitioner from the various transferors heretofore referred to, examining reports of such transferors, preparing audit reports on the cash receipts and disbursements of such transferors subsequent to February 14, 1925, devising and installing a general accounting system and a cost accounting system for the petitioner and making the opening entries therein, and supervising the operation of the accounting system of the petitioner for practically all of 1925. The amount paid by the petitioner for the services thus

rendered was charged to organization expense, was not claimed as a deduction in the petitioner's return, and was not allowed as a deduction in determining the deficiency in controversy.

The petitioner contends that the expenditure in question was an ordinary and necessary expense of doing business. This the respondent denies. The petitioner urges that the work for which the expenditure was made may be divided into that relating to the inventories which it purchased and that relating to the installation of an accounting system. It insists, however, that it is of no importance to allocate the amount of the expenditure between the two divisions for the reason that no part of the amount has ever been claimed or allowed. It contends that the portion of the amount that was paid for work relating to inventories was an additional cost of the inventories and, since it was not added to inventories nor allowed as a deduction when sold, it is now deductible.

We agree with the idea of the petitioner that the work done by the firm of accountants may be divided into two parts, but we differ with it as to the importance of the allocation of the amount expended. We think the portion of the amount that was for work done in checking or identifying inventories is properly chargeable to the cost of such inventories and deductible as part of the cost of merchandise sold as and when the inventories were sold by the petitioner. But the petitioner has failed to inform us as to what portion of the amount was for work relating to inventories. Nor is there any indication in the record as to what portion, if any, of the inventories remained on hand and unsold at the end of the year. Whether the petitioner is able to furnish such information we do not know; however, it has made no attempt to do so and now urges that it is not important that it should. Under these circumstances we are not in a position to allow as a deduction any portion of the expenditure as the amount applicable to work done on inventories. With respect to the portion of the amount applicable to the work of installing a general accounting system and a cost system, that is allowable. *Schlosser Bros., Inc.*, 2 B. T. A. 137; *North Star Granite Corporation*, 21 B. T. A. 222. But again the petitioner has failed to furnish us any basis for determining the portion of the expenditure applicable to this phase of the work, and consequently nothing can be allowed with respect to it. In view of the foregoing we think the petitioner's contention for the allowance of the amount of $20,000 as a deduction must be denied.

*Expenditures for Privilege of Carrying on Business, Stock Transfer Services, etc.*

Although the petitioner is a Delaware corporation, its principal office is at Charleston, West Virginia, and its operating office is at Monroe, Louisiana, where its principal gas properties are located.

During 1925 it qualified to do business in West Virginia and Louisiana and for the privilege of carrying on business in these states it paid them in 1925 amounts totaling $2,867.50.

The Guaranty Trust Co. of New York is the transfer agent for the preferred stock and common stock of the petitioner. On May 11, 1925, the petitioner paid that company $139.50 for the " numbering of the stock certificates issued ", apparently as stock issued in exchange for assets. On June 30, 1925, the petitioner paid the company $182.75 for " transfer services " which, so far as we can determine, were also in connection with the original issuance of the petitioner's stock.

The amount of $2,867.50 paid the states of West Virginia and Louisiana for the privilege of doing business in those states and the amounts of $139.50 and $182.75 paid the Guaranty Trust Co. of New York were charged by the petitioner to its organization expense account, which in turn was charged off the petitioner's books in 1926. The amounts were never taken out of the organization expense account, were never taken as deductions, and were not allowed as deductions in determining the deficiency in controversy.

In its petition the petitioner alleged that the respondent erred in failing to allow a deduction in the amount of $16,636.47 representing a number of specified expenditures, including those set forth above as made to the states of West Virginia and Louisiana and the Guaranty Trust Co. of New York. However, at the hearing the petitioner waived its claim for a deduction of the expenditures except in so far as it involved the items set out above. These the petitioner contends constituted ordinary and necessary expenses of carrying on its business and therefore are allowable deductions.

In our opinion the amounts paid to the States of West Virginia and Louisiana for the privilege of carrying on business in those states are allowable deductions. With respect to the nature of the expenditures for numbering stock certificates and " transfer services " the evidence is not very clear. So far as we can determine these expenditures were in connection with the original issue of the petitioner's stock. An expenditure incurred in connection with the issuance of capital stock does not constitute " an ordinary and necessary expense of carrying on a trade or business " and hence is not an allowable deduction. *Baltimore & Ohio Railroad Co.*, 29 B. T. A. 368. The contention of the petitioner with respect to the allowance of these items is accordingly denied.

*Decision will be entered under Rule 50.*