FRANK R. BAVIS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

THOMAS F. BELL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

DONATO A. GIANGIULIO, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 26414, 26734, 27398.   Promulgated May 29, 1952.

*Logan Morris, Esq.*, for the petitioners.
*Jules I. Whitman, Esq.*, for the respondent.

424

OPINION.

BLACK, *Judge:*

## *Issue 1.*

This issue raises the following question: Are the petitioners entitled to apply the provisions of section 107(d) of the Code to the fair market value of certain shares of stock received from their employer in 1946 pursuant to the terms of a previous contract with said employer, or is such amount all taxable as income in the year when received? The applicable section of the statute and Treasury regulations are printed in the margin.[1]

---

[1] SEC. 107. COMPENSATION FOR SERVICES RENDERED FOR A PERIOD OF THIRTY-SIX MONTHS OR MORE AND BACK PAY.

(d) BACK PAY.—

(1) IN GENERAL.—If the amount of the back pay received or accrued by an individual during the taxable year exceeds 15 per centum of the gross income of the individual for such year, the part of the tax attributable to the inclusion of such back pay in gross income for the taxable year shall not be greater than the aggregate of the increases in the taxes which would have resulted from the inclusion of the respective portions of such back pay in gross income for the taxable years to which such portions are respectively attributable, as determined under the regulations prescribed by the Commissioner with the approval of the Secretary.

(2) DEFINITION OF BACK PAY.—For the purposes of this subsection, "back pay" means (A) remuneration, including wages, salaries, retirement pay, and other similar compensation, which is received or accrued during the taxable year by an employee for services performed prior to the taxable year for his employer and which would have been paid prior to the taxable year except for the intervention of one of the following events: (i) bankruptcy or receivership of the employer; (ii) dispute as to the liability of the employer to pay such remuneration, which is determined after the commencement of court proceedings; (iii) if the employer is the United States, a State, a Territory, or any political subdivision thereof, or the District of Columbia, or any agency or instrumentality of any of the foregoing, lack of funds appropriated to pay such remuneration; or (iv) any other event determined to be similar in nature under regulations prescribed by the Commissioner with the approval of the Secretary; * * *

Regulations 111, section 29.107–3 (added to the Regulations by T. D. 5855) provides, in part as follows:

There can be no doubt from the facts which have been stipulated that the shares of stock in the newly organized corporation which were distributed to Bavis, Bell, and Giangiulio in 1946 were distributed to them as additional compensation for remaining in the employ of the Company from the date of the agreement in 1928 to the final accounting which was had in 1946. Whether petitioners are entitled to treat for income tax purposes the fair market value of the shares of stock which they received in 1946 as back pay depends upon whether the distribution of stock in 1946 falls within the statutory definition of "back pay." The applicable statute carries its own definition of "back pay" and we have printed that definition in the margin. It says:

* * * For the purposes of this subsection, "back pay" means (A) remuneration, including wages, salaries, retirement pay, and other similar compensation, which is received or accrued during the taxable year by an employee for services performed prior to the taxable year for his employer *and which would have been paid prior to the taxable year except for the intervention of one of the following events:* * * * [emphasis added].

We do not think the payments here involved meet the conditions prescribed in the language which we have emphasized above. Regulations 111, section 29.107–3 provides, in part, as follows:

An event will be considered similar in nature to those events specified in section 107 (d) (2) (A) (i), (ii), and (iii) only if the circumstances are unusual, if they are of the type specified therein, if they operate to defer payment of the remuneration for the services performed, and if payment, except for such circumstances, would have been made prior to the taxable year in which received or accrued. * * *

It seems clear to us that the operation of the Chichester Chemical Company under the arrangement with the creditors' committee did not operate to defer payment to petitioners of the shares of stock which were issued to them in 1946. In fact, the very condition which entitled them to the shares of stock in 1946 was that they remain with the Company until all creditors were paid. That was what entitled them to receive the extra compensation. The facts show that under the agreement of February 15, 1928, the petitioners were to receive certain definite salaries plus additional compensation fixed on a percentage of gross sales. That is shown in paragraph 1 of the agreement wherein it says:

An event will be considered similar in nature to those events specified in section 107 (d) (2) (A) (i), (ii), and (iii) only if the circumstances are unusual, if they are of the type specified therein, if they operate to defer payment of the remuneration for the services performed, and if payment, except for such circumstances, would have been made prior to the taxable year in which received or accrued. For the purposes of this section the term "back pay" does not include * * * additional compensation for past services where there was no prior agreement or legal obligation to pay such additional compensation, or any amount which is not includible in gross income under chapter 1.

1. The parties of the third part shall retain their respective positions and perform the duties heretofore performed by them in connection with the business of the Chichester Chemical Company at the same fixed salaries as those received during the year 1927. The additional compensation for 1928 shall be paid to them in equal shares on the basis of six per cent. of the gross sales of the Company. * * *

So far as the records show these regular salaries plus the additional compensation agreed upon out of gross sales were paid to Bavis, Bell, and Giangiulio over the intervening years from 1928 to 1945, inclusive, and these amounts are not here in controversy. So far as we can see that was all they were entitled to receive in those prior years irrespective of whether the operation of the business under the creditors' agreement was similar in nature to bankruptcy or a receivership. Under the provisions of paragraphs 3, 4, and 5 of the agreement these key employees, including Bavis, Bell, and Giangiulio were to receive an interest in the business provided that they remained with the Company until all the creditors were paid and the administration ended. If any key employee died in the meantime his estate was to receive the part to which he would have been entitled had he lived out the term. We fail to see where any of the petitioners herein could have demanded in any year prior to 1946 that any of the stock should be issued to them regardless of how solvent and able to pay the Company might have been. Thus, we do not think that one of the vital requirements prescribed in the definition of "back pay" has been met and petitioners cannot be sustained in their contention that the amounts represented by the fair market value of these shares of stock should be taxed as "back pay" under the provisions of section 107 (d), I. R. C.

Petitioners in their brief strongly rely on *Langer's Estate* v. *Commissioner*, 183 F. 2d 758. We think that case is distinguishable on its facts. In the *Langer* case, *supra*, R. L. Langer and his associate, C. A. Lindsey, were officers and employees of Commodore Hotel Co., Ltd., and although claiming to be entitled by corporate action to compensation of $600 per month each, neither received any salary during the years 1938 through 1942. In each of those years through 1941, Commodore suffered operating losses, its balance sheets showing continuing deficits, and it was unable to pay Langer and Lindsey their accrued salaries because it had to use its available funds to prevent foreclosure of a mortgage on its hotel building, furnishings, and fixtures. However, in January 1943, for the first time Commodore had become financially able to resume payment of salaries to Langer and Lindsey, and in January 1944, the board of directors ordered payment of the *accrued back salaries* as rapidly as the corporation's financial condition would warrant. Pursuant to this action, Langer and Lindsey each received in addition to current salaries,

$10,000 in 1944 and $11,500 in 1945. In their income tax returns for those years Langer and Lindsey treated the $10,000 and $11,500 as "back pay" under the provisions of section 107 (d) of the Code. The Commissioner determined the amounts were not back pay within the meaning of the applicable statute because Commodore had not been prevented from paying these salaries in the years when due because of an event similar in nature to bankruptcy or receivership, and treated the amounts as income taxable in the years when received. We affirmed the Commissioner, see 13 T. C. 419. The Ninth Circuit reversed us in *Langer's Estate* v. *Commissioner, supra.* The court in reversing us, among other things, said:

Under these findings, it is quite clear to us that the event which operated to defer the payment of the salaries of Langer and Lindsey was an event similar in nature to bankruptcy or receivership, for Commodore, during the years in question, was admittedly insolvent and was operating only at the sufferance of Pacific, which was, at all times, in a position to foreclose its deed of trust and mortgage on the hotel and its furnishings and, in fact, refrained from doing so inasmuch as it appeared that all available revenues were being applied by Commodore toward the payment of its indebtedness to Pacific rather than toward the payment of salaries to the corporate officers. If the situation in which Commodore found itself was not one similar to "bankruptcy or receivership" within the meaning of the Code, Section 107 (d) (2), and the Regulations, * * * then those statutory words have no meaning, for the only element of legal bankruptcy lacking was a formal judicial declaration,—a determination which the corporation or its creditors could have procured at any time,—and it is obvious that to require such an official determination would be equivalent to saying that the only event similar to bankruptcy is bankruptcy itself.

Even if we assume in the instant case that the operation of the Company under the creditors' agreement was an event similar to bankruptcy or receivership and that *Langer's Estate* v. *Commissioner, supra,* would be good authority for so holding, petitioners would not win in the instant case because such operation of the business under the creditors' committee plan did not "operate to defer payment of the remuneration" to petitioners for services performed for the business and payment would not have been made prior to the taxable year 1946. (See Regs. 111, sec. 29.107–3.) As we have pointed out, it was not *until* 1946 that petitioners were entitled to be paid this additional compensation in the form of shares of stock in the newly organized corporation. Under these circumstances we fail to see how such amounts can be adjudged "back pay" within the meaning of section 107 (d). The only salaries and other compensation which became due and payable to petitioners by the Company during the years 1928 to 1945, inclusive, were the regular salaries which the Company agreed to pay them, plus their percentage of gross sales. These amounts were paid in the years when due and are not involved here.

For reasons we have already explained, nothing accrued in petitioners' favor as to the shares of stock which were issued and paid to them in 1946, until 1946. It was in that year that such extra compensation was both accrued and paid. Therefore, we regard the *Langer* case, *supra*, as inapplicable and not controlling here.

### Issue 2.

With respect to the $2,671.17 received by petitioner Bell from Giangiulio, we are of the opinion that the record here does not show an employer-employee relationship between Bell and Giangiulio which is a prerequisite for the application of section 107 (d). The only fact of record is that Giangiulio, upon his appointment as administrator of the estate of D. D. Chidester, entered into an oral agreement with Bavis and Bell under which he agreed to share his commissions equally with them for services performed for him in connection with the administration of such estate. Certainly Bavis and Bell were not employees of the estate under this oral agreement. There is no showing as to the amount of direction and control Giangiulio exercised over Bavis and Bell under such agreement which is one of the basic elements of an employer-employee relationship. On the contrary, the facts tend to indicate that the relationship between the petitioners under the oral agreement was more closely analogous to that of joint adventurers rather than that of employer and employees. The relation of joint adventurers is created, generally speaking, when two or more persons combine their property, money, efforts, skill, or time in some common undertaking. Here we have three men all actively engaged in the management of what was the most important asset of the estate, the Company. The executrix died and Giangiulio was appointed administrator of the estate. After his appointment, he agreed to divide his commissions with Bavis and Bell if they would perform certain services for him in connection with the administration of the estate. The record is silent as to what services Bavis and Bell performed but it must be assumed that Giangiulio was satisfied since he made payment in accordance with the agreement. They all had an equal stake and an equal reward in its proper administration. However, in any event, it is not necessary to decide whether petitioners were joint adventurers since petitioner Bell has failed to prove that he was an employee of Giangiulio. On this issue we hold for the respondent.

Reviewed by the Court.

*Decisions will be entered for the respondent.*

RICE, *J.*, dissenting: I dissent on the first issue and would hold that the shares of stock distributed to petitioners in 1946 constituted back pay under section 107 (d) of the Code.

As set out in the majority opinion, back pay includes compensation received or accrued during *the taxable year* by an employee for services performed prior to the taxable year and which would have been paid prior thereto except for the intervention of certain events. One such event is bankruptcy or receivership of the employer, and another is any other event determined to be similar in nature under regulations prescribed by the Commissioner. Regulations 111, section 29.107–3, provides:

An event will be considered similar in nature to those events specified in section 107 (d) (2) (A) (i), (ii), and (iii) only if the circumstances are unusual, if they are of the type specified therein, if they operate to defer payment of the remuneration for the services performed, and if payment, except for such circumstances, would have been made prior to the taxable year in which received or accrued. For the purposes of this section the term "back pay" does not include * * * additional compensation for past services where there was no prior agreement or legal obligation to pay such additional compensation. or any amount which is not includible in gross income under chapter 1.

The majority opinion agrees that the shares of stock were distributed to petitioners as additional compensation for remaining in the employ of the Company, which means it was for services which they had performed for the Company from 1928 to 1946; but holds that the fair market value thereof was not back pay within the meaning of the statute because "nothing accrued in petitioners' favor as to the shares of stock which were issued and paid to them in 1946, until 1946." The majority say this is true even assuming that the operation of the Company under the creditors' agreement was an event similar to bankruptcy or receivership.

As shown by the findings of fact, the executrix, in order to preserve the estate and prevent the sacrifice of its assets, entered into an agreement with the major creditors which provided for the continued operation of the Company and the gradual payment of the debts of the estate out of the profits therefrom. The agreement left the executrix wide discretion in handling the business and fixed minimum and relatively large amounts to be paid on account of claims each month and on taxes and carrying charges on real estate. It also provided that failure to meet these requirements would be fatal to the plan at the option of a majority of the larger creditors.

The success of the plan depended upon retaining the services of several key employees, including petitioners. These key employees, who were receiving relatively small salaries, were recognized in the employment contract of February 15, 1928, as being essential for the successful operation of the creditors' agreement of the same date and to continue to operate the business. They agreed to devote their entire time and attention to the business and to remain in the employ of the business at approximately the same low rate of compensation; pro-

vided that, when the creditors were paid off, the key employees would be entitled to a 50 per cent share of the business, and upon the death of Elizabeth Chidester, her executors would convey an additional 5 per cent interest in equal shares to them, as set out in the employment agreement. The financial condition of the estate, which necessitated the creditors' agreement and the concomitant obligations imposed thereby, made it impossible to pay said employees, currently, sufficient salary to induce them to remain in and operate the business. The agreement, therefore, provided for the transfer to the key employees of an equitable interest in the business in varying proportions. Under the two agreements, the transfer of ownership had to be postponed until completion of the administration of the estate and the payment of its debts. The creditors' agreement specifically required the executrix to "conduct the business as it was run by Davitt D. Chidester during his lifetime," and this meant as a sole proprietorship. Thus, it is evident that the creditors' agreement and the employment agreement were each a part of one over-all transaction, one being dependent on the other. Had the Company made sufficient profits in years prior to 1946 and paid off the creditors, thereby meeting the requirements of the creditors' agreement, the right of petitioners to their proportionate share of the business would have become absolute and would have been distributed to them in a prior taxable year. It seems clear, therefore, that the receipt of the shares of stock of the Company in 1946 by the petitioners constituted compensation for services performed prior to the taxable year for which payment would have been made except for the circumstances discussed above. See *James Newton Dean*, 10 T. C. 672 (1948).

The facts in *Langer's Estate* v. *Commissioner* (C. A. 9, 1950) 183 F. 2d 758,[1] are somewhat similar to the facts of this case. In that case Langer and one Lindsey, during the period in question, were officers and employees of Commodore Hotel Co., Ltd., a California corporation. Although claiming to be entitled by corporate action to compensation of $600 per month each, neither received any salary during the years from 1938 through 1942. In each of the years, from 1938 through 1941, Commodore suffered operating losses, its balance sheets showing continuing deficits. Throughout the period, the corporation's hotel building, fixtures, and furnishings were subject to a deed of trust and chattel mortgage, securing a promissory note payable to Pacific Mutual Life Insurance Co., on which Commodore was chronically in default. However, in January 1943, Commodore (having, in 1942, for the first time for a number of years realized operating profits), after making the required installment payments on its indebtedness to Pacific, became financially able to resume payment of

---

[1] See also *Estate of R. L. Langer*, 16 T. C. 41 (1951), aff'd. (C. A. 9) 194 F. 2d 288.

salaries to Langer and Lindsey. In January 1944, the board of directors ordered payment of the accrued back salaries as rapidly as the corporation's financial condition would warrant. Pursuant to this action, Langer and Lindsey received, in addition to current salaries, $10,000 in 1944 and $11,500 in 1945. The Court in its opinion said at page 760:

> Under these findings, it is quite clear to us that the event which operated to defer the payment of the salaries of Langer and Lindsey was an event similar in nature to bankruptcy or receivership, for Commodore, during the years in question, was admittedly insolvent and was operating only at the sufferance of Pacific, which was, at all times, in a position to foreclose its deed of trust and mortgage on the hotel and its furnishings and, in fact, refrained from doing so inasmuch as it appeared that all available revenues were being applied by Commodore toward the payment of its indebtedness to Pacific rather than toward the payment of salaries to the corporate officers. If the situation in which Commodore found itself was not one similar to "bankruptcy or receivership" within the meaning of the Code, Section 107 (d) (2), and the Regulations (Treasury Reg. 111, Section 29.107-3), then those statutory words have no meaning, for the only element of legal bankruptcy lacking was a formal judicial declaration,—a determination which the corporation or its creditors could have procured at any time,—and it is obvious that to require such an official determination would be equivalent to saying that the only event similar to bankruptcy is bankruptcy itself.

In *Norbert J. Kenny*, 4 T. C. 750 (1945), the taxpayer was an officer of a corporation serving under a contract calling for a specified salary. The corporation wished to obtain a loan from the Reconstruction Finance Corporation, which imposed a condition that a portion of the taxpayer's salary be retained and not paid to him until the loan was repaid to the R. F. C. In that case, although the restriction on the payment was voluntarily accepted by the corporation and by the taxpayer, this Court held that, inasmuch as it was a restriction imposed by the Government agency, it was analogous to a restriction imposed by a receiver, and relief was granted under section 107 (d) (2) (A) (iv).

The majority opinion distinguishes the *Langer* case on the ground that the back salaries there had *accrued* prior to the taxable year in which received, but states that even assuming that in the instant case that operation of the Company under the creditors' agreement was an event similar to bankruptcy or receivership and that the *Langer* case would be good authority for so holding, petitioners would not win here "because such operation of the business under the creditors' committee plan did not 'operate to defer payment of the remuneration' to petitioners for services performed for the business and payment would not have been made prior to the taxable year 1946." This statement is obviously in error. It is clear from the findings of fact that the transfer of an interest in the business to the key employees had to be postponed until completion of the administration of the

estate and the payment of its debts. The two agreements were part of one over-all transaction; and, if sufficient profits had been made in a year prior to 1946 and the creditors had been paid off, the petitioners' right to the interest in the business as set out in the employment agreement would have become absolute in that prior year. To say that the creditors' agreement did not operate to defer payment of the remuneration prior to the taxable year 1946, ignores the facts of record. The executrix could not, under the creditors' agreement, transfer an interest in the business because it required her to operate it as a sole proprietorship until the creditors had been paid off. The record shows clearly that payment would have been made prior to the taxable year except for such circumstances, and this case, therefore, falls squarely within the language of the statute and the regulations.

The majority opinion also states that "The only salaries and other compensation which *accrued* in petitioners' favor by the Company during the years 1928 to 1945, inclusive, were the regular salaries which the Company agreed to pay them, plus their percentage of gross sales" and that "nothing accrued in petitioners' favor as to the shares of stock which were issued and paid to them in 1946, until 1946." The majority misconstrue the clear and unambiguous language of the statute. It relates to compensation "accrued during the taxable year" not accrued prior thereto. The interpretation placed on the statute by the majority adds a restriction unwarranted by its express language and is, in effect, judicial legislation. It is true that the regulations provide that "the term 'back pay' does not include  *  *  * additional compensation for past services where there was no prior agreement or legal obligation to pay such additional compensation," but that is not applicable under these facts where there was a definite agreement and legal obligation to pay an undivided interest in the business to petitioners if they performed the services contracted for. They performed the services, were paid in stock, and all obligations under the 1928 agreement were therefore executed.

The rationale of this dissent does not conflict with our holding in the recent case of *Elsie L. Sedlack*, 17. T. C. 791 (1951), (now on appeal, C. A. 7, Feb. 19, 1952), where we held that the statutory definition of back pay is not satisfied where there was no legal liability or agreement on the part of the employer to pay any compensation other than the amounts actually received by the taxpayers in years prior to the taxable year.

The facts clearly indicate that the entire estate, including the Company, was insolvent. The liabilities exceeded the assets by approximately $200,000, and the only hope which the creditors had of realizing fully on the amount owing to them was to keep the business operating and have the debts of the estate liquidated over a period of time. This seems to have been the sole purpose of the creditors' agree-

ment; and, in order to carry out its terms, it was essential that the key employees be induced to remain with the business. If the creditors could have realized 100 per cent on their claims on the date of decedent's death, there would have been no reason for them to agree to postpone payment over an indefinite period.

This case is also similar to the *Langer* case, *supra*, in that the creditors here (holding a majority in amount of the claims), like the creditors in the *Langer* case who were in a position to foreclose at all times, could cancel the creditors' agreement and then participate in the remaining assets of the estate in proportion to the unpaid balances of their accounts, if there was default in any monthly payment for a period of 60 days. As shown in the findings of fact, the income of the business was never sufficient to meet the required payments, and consequently a majority of the creditors could have cancelled the agreement at any time. This was the situation in the *Langer* case which was held to be similar to a receivership.

No specific salary restrictions were imposed by the creditors' agreement, but restrictions may be imposed just as effectively by the creditors demanding periodic minimum payments equal to or in excess of the net income of the business as by requiring a ceiling on compensation, and that is, in effect, what happened in this case. The additional compensation agreed upon was reasonable under all the circumstances, but its payment had to be postponed until the debts were liquidated, as the creditors naturally did not want a reduction in the assets or security to which they had to look for payment. It was the financial condition of the estate that necessitated the employment agreement and continued postponement of the payment of the compensation in question.

Only the financial condition of the estate prevented earlier payment. The circumstances were unusual. They were similar to restrictions imposed in a bankruptcy or receivership proceeding, and, except for such circumstances, payment would have been made prior to the taxable year. I would, therefore, hold for petitioners on this issue.

JOHNSON, *J.*, agrees with this dissent.