**GRACELAWN MEMORIAL PARK, Inc.,**
**Appellant,**

**v.**

**UNITED STATES of America.**

**No. 12594.**

United States Court of Appeals
Third Circuit.

Argued Oct. 7, 1958.

Decided Oct. 29, 1958.

James R. Morford, Wilmington, Del. (Leonard L. Cowan, Chicago, Ill., on the brief), for appellant.

John J. Pajak, Washington, D. C., (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attys., Dept. of Justice, Washington, D. C., Leonard G. Hagner, U. S. Atty., Wilmington, Del., on the brief), for the United States.

Before GOODRICH, McLAUGHLIN and STALEY, Circuit Judges.

GOODRICH, Circuit Judge.

This is an appeal from a judgment for the United States in a suit brought by a taxpayer, Gracelawn Memorial Park, Inc., to recover for taxes paid and, it is alleged, erroneously collected. The issue turns on whether certain sums paid in connection with the purchase of cemetery lots were includible in the taxpayer's (Gracelawn) gross income.[1]

The facts are not complicated and a simple statement will bring out the question involved. Gracelawn Memorial Park, Inc. (Gracelawn) is a corporation organized for profit. It maintains a cemetery of the memorial park type in the State of Delaware. Its business consists of three items: (1) Sale of cemetery lots; (2) Services with respect to interment of persons who are to be buried in the cemetery; and (3) Sale of markers for graves of those buried. When a purchaser buys a burial lot he is required, by his contract, to pay an additional sum which is a certain portion of the lot purchase price specified in the contract. These additional payments are deposited in two funds by Gracelawn.[2] One of these funds is a trust for perpetual care. This insures the continuous maintenance of the purchaser's lot and the general condition of the cemetery. The other special fund is a building fund. This is set up in a trust instrument and it is the situation created by payments to this fund which is the occasion for this lawsuit.[3]

The taxpayer, in this suit, seeks to recover a portion of its taxes paid in 1952, 1953 and 1954. It contends that the money paid into this building fund by lot purchasers did not constitute part of Gracelawn's gross income for the taxable years in question.[4]

The trust instrument around which the controversy revolves was written with skill and thoroughness. It is a much more tightly drawn document than that which the Fourth Circuit had before it in National Memorial Park v. Commissioner, 4 Cir., 1944, 145 F.2d 1008, discussed by both parties in the argument of this

---

1. We speak of "purchase" of cemetery lots in a colloquial sense. It makes no difference in this case whether the "purchaser" acquires a fee or simply a right of sepulcher in a piece of land.

2. The Government contends that the payments by lot purchasers for the funds are part of the purchase price of the lot. The taxpayers urges that the lot purchase price and the payments into the funds are separate items. Either view

of the transaction is acceptable, since neither view determines the issue.

3. The Commissioner does not contend here that the payments to the perpetual care fund are includable in Gracelawn's gross income.

4. The years 1952 and 1953 are governed by the 1939 Code, Int.Rev.Code of 1939, § 22(a), 26 U.S.C.A. § 22(a). The year 1954 is governed by the 1954 Code, Int. Rev.Code of 1954, § 61, 26 U.S.C.A. § 61.

case. It has been summarized adequately and accurately by Judge Layton in his opinion in the district court[5] and his summary is set out in full in the margin.[6]

5. D.C.D.Del.1957, 157 F.Supp. 516, 517–518.

6. " 'Whereas, it is desired that a suitable building or buildings be built for the use of lot owners, and their families as a chapel, administrative building and for such other purposes as are consistent with the operation of a cemetery, * * '

"The trust fund provides (pp. 1–2) that at least 15 per cent of the purchase price of each lot shall be placed into the trust. This amount shall be deposited with the trustees and although a higher amount may be deposited pursuant to an agreement with the lot purchasers, the 15 per cent of the purchase price is a minimum below which the deposit may not go. (Par. 1.)

"The trust provides that the deposit in the trust may be taken from the final payment made by purchasers of the lot and that the cemetery association (the taxpayer) may contribute moneys or securities to the trust fund and may advance moneys from time to time to the trust fund in anticipation of the deposits required to be made out of collections to be received. There are no duties placed on the trustees to see to the collection or disposition of the moneys collected pursuant to the sales agreement or to take any action in the event such moneys are not deposited into the trust. (Par. 2.)

"Subject to the approval of the taxpayer the trustees are directed to invest the principal of the trust fund, with the income from these investments being added to the principal of the trust. (Par. 3.)

"After deposits, gifts, and accumulations of income aggregate at least $75,000, the trustees are directed to use these funds for the acquisition of a suitable site or sites, the erection of a building or buildings on the land so acquired or the furnishing of the same. The plans, specifications and payments for work and material for the building or buildings are subject to the approval of the taxpayer. After the buildings have been completed and approved by the taxpayer, the trust provides that title thereto 'for the benefit of the lot owners and the Cemetery Association' shall remain with the trustees for 50 years after which time title to the ground and buildings pass in trust to the taxpayer. (Par. 4.)

"The taxpayer agrees to maintain and operate the buildings after they have been constructed, but all charges made for any purpose shall be paid to the taxpayer. (Par. 5.)

"It is provided that, if sufficient funds are not received within 20 years to enable the erection and furnishing of such buildings, the money so collected shall be returned to the lot purchasers making such deposits or to their personal representatives or heirs. (Par. 6.)

"If the building or buildings contain rooms, vaults, crypts, columbariums or other spaces sold or leased, any sales proceeds or rentals shall be placed in the trust fund until the buildings are completed, except for 10 per cent of the sums received which shall be placed in the trust for care. After the buildings have been completed, ninety per cent of the sums so received shall be paid to the taxpayer and ten per cent shall be placed in the trust for care. (Par. 7.)

"The trust provides that construction loans may be secured and that the taxpayer may guarantee the payment thereof. If the building or buildings are encumbered by a mortgage, the net income from the buildings so erected shall be used to repay the mortgage, and after repayment has been made, the net income shall be paid to the taxpayer. (Par. 8.)

"The taxpayer agrees to keep such buildings in repair and insured. (Par. 9.)

"Paragraph 10 of the trust provides that the trustees shall not pay any of the trust funds to the cemetery association and that any funds remaining after the erection of the buildings shall be placed in the trust fund for care.

"Paragraph 11 provides that the trustees are entitled to reasonable compensation for their services and that the trustees shall have a lien upon the trust funds for this purpose.

"Paragraph 12 states that the trustees shall consist of the president, vice-president, secretary and treasurer and one member at large from the board of directors of the taxpayer. It provides that upon each new election and/or appointment of a member or members of the executive committee, subsequent to the date of the trust agreement, a certificate thereof shall be furnished by the secretary or treasurer to the trustees.

"In the event of resignation of any trustee, a new trustee or trustees may be appointed by the taxpayer by resolution of its board of directors. The taxpayer has the right at any time by resolution or order of its board of directors for any cause or reason which to it shall seem proper to designate and appoint a new trustee. (Par. 13.)

The Government attacks, although not head on, the provisions of the trust. The suggestion is that this is not a real trust but another name for Gracelawn itself. It is true that there is complete interlocking of the trustees with officers of Gracelawn. It is also true that Gracelawn, in its corporate capacity, has in fact substantial control over the operation of this trust. But it is also true that in the event the objects of the trust are not carried out the payments are to be remitted to Gracelawn's customers or their representatives and not back to Gracelawn. We do not stop long with this point for we are not prepared to call the trust invalid nor need we do so to settle this case.

The language which we think raises the real problem comes in the trust agreement setting up the building fund. The preamble states the desire that a suitable building or buildings be built "for the use of lot owners and their families as a chapel, administrative building and for such other purposes as are consistent with the operation of a cemetery  *  * ." When the trust fund reaches $75,000 the trustees are directed, as appears in Judge Layton's summary,[7] to use the funds for the acquisition of a suitable site or sites and for erection of a building on the land acquired. Gracelawn, at the discretion of its officers, may accelerate the growth of this fund by additional appropriations to it.

Despite the care with which this trust agreement is drawn and the perseverance with which arguments have been made to exclude the payments from the gross in-come of the taxpayer, we think that clearly the building fund payments are part of taxpayer's gross income and that the district court was correct in so holding. Gracelawn argues that this fund is just like the fund for perpetual care which in the past has not been includible as part of a cemetery's gross income. Commissioner of Internal Revenue v. Cedar Park Cemetery Ass'n, 7 Cir., 1950, 183 F.2d 553; American Cemetery Co. v. United States, D.C.D.Kan.1928, 28 F.2d 918; Troost Ave. Cemetery Co. v. United States, D.C.W.D.Mo.1927, 21 F.2d 194. It is conceded that cemetery lots sold with a perpetual care agreement will benefit a cemetery company by providing a more attractive burying ground than one in which there is no perpetual care provision for lots purchased. And it can be agreed that people who can afford it would rather have a lot with perpetual care than one that does not carry that provision. Thus, the perpetual care arrangement no doubt helps sell cemetery lots.

But the provisions in litigation here are quite different and go well beyond those sustained in the perpetual care cases. There is contemplated in the trust agreement the possibility of the construction of facilities for other types of burial —"vaults, crypts, columbariums." A charge will be made for the use of these facilities which after completion of the building will be retained by Gracelawn.[8] The taxpayer makes an argument distinguishing taxability for the tax years here involved from what would occur if and when crypts, columbariums, etc. are

"Paragraph 14 provides that the taxpayer has the right to inspect the books of the trustees and compel an accounting.

"Paragraph 15 provides that the cemetery association 'reserves to itself the right to amend or modify this Agreement but no modification or agreement shall be made which shall limit or destroy the Trust hereby created or permit the payment of the principal of the Trust to the Cemetery Association.'

"Paragraph 16 provides that no member or creditor of the taxpayer or lot owner shall have any right to the trust assets and these assets are not to be subject to attachment, garnishment, execution or demand on the part of any shareholder or creditor of the taxpayer or lot owner, it being 'the intention that the cemetery and space owners as a whole shall be the sole beneficiaries of this Trust, as provided herein.' "

7. See note 6, supra.

8. The trust agreement provides that until completion of the building in which these burial chambers will be housed the proceeds from the sales of vaults and the like should be apportioned between the building and perpetual care trust funds.

built. It acknowledges that when income begins to be received from such construction that income is subject to taxation. Of course this conclusion is correct. But it is irrelevant. Our question is not whether the money received from the use of a capital investment is taxable but whether the money received with which this income producing asset will be built is taxable. Teleservice Company of Wyoming Valley v. Commissioner, 3 Cir., 1958, 254 F.2d 105, is comparable in this phase of the case.

Further, suppose the building fund does provide a building for administration and a chapel. It appears from the depositions in this case that the present administration building, deemed inadequate by an officer of Gracelawn, is used for salesmen's meetings and other activities pursuant to the running of an enterprise for profit. While a chapel, as this officer pointed out, is convenient for people who have burial rites to perform in bad weather, it is remembered that part of the income of Gracelawn comes from charges made for services in connection with burials. And, as far as we can see, there is no reason why a charge should not be made.

Finally, the preamble to the agreement is so broad as to include "such other purposes as are consistent with the operation of a cemetery." Any ordinary construction of a document would certainly require the specific provisions to be interpreted in the light of a statement of purpose. In other words, we find in this careful document a provision for what is in effect a deferred building fund for the purpose of the taxpayer's enterprise for profit. Of course these provisions benefit a lot owner in the sense that it makes his purchase one in a more desirable and better kept-up cemetery. But we think the provision for a capital fund is there just the same and it is for the corporation's benefit.

Gracelawn makes much of the point that under the provisions of the trust this money, accumulated during the taxable years here involved, is not now available to the taxpayer. It says that this fact makes the fund not "income" under the rule of Eisner v. Macomber, 1920, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521. But the argument will not stand close inspection. We are willing to concede here that the trust is effective and that persons whose money goes into it will get it back if the trust fails. But the broad provisions of the trust make it readily available to promote future capital improvements in the taxpayer's property.[9] The situation is comparable, although not precisely like, Wayne Title & Trust Co. v. Commissioner, 3 Cir., 1952, 195 F.2d 401; Teleservice Company of Wyoming Valley v. Commissioner, 3 Cir., 1958, 254 F.2d 105.

Authorities on the precise point are few.[10] But we think the principle is perfectly clear.

The judgment of the district court will be affirmed.

---

9. The trust agreement precludes the trustees from beginning the construction until at least $75,000 has been accumulated in the fund. By mid-June 1957 the accumulation of principal and interest in the building trust fund was $31,321.07. Under the trust agreement Gracelawn may, of its own volition, contribute money or securities to the trust. Gracelawn is permitted to amend or modify the trust, limited only in that "no modification or agreement shall be made which shall limit or destroy the Trust . . . or permit the payment of the principal of the Trust" to Gracelawn.

10. Compare National Memorial Park v. Commissioner, 4 Cir., 1944, 145 F.2d 1008, with Acacia Park Cemetery Ass'n, Inc., v. Commissioner, 7 Cir., 1934, 67 F.2d 700.