*Decisions will be entered under Rule 50.*

MOUNT VERNON GARDENS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 67301. Filed June 28, 1960.

*Charles W. Davis, Esq.,* and *John C. Walker, Esq.,* for the petitioner.

*David M. Robinson, Esq.,* for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in petitioner's income tax for its fiscal year ended October 28, 1954, in the amount of $31,350.50, and for its fiscal year ended October 27, 1955, in the amount of $44,871.42. The sole issue for decision is whether respondent was correct in including in petitioner's gross income that portion of the proceeds from the sale of burial spaces turned over by petitioner to a trustee of a development trust fund.

#### FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

Petitioner, Mount Vernon Gardens, Inc. (sometimes hereinafter referred to as the Company), is a cemetery corporation organized

for profit in 1952 under the laws of Tennessee. Its office and principal place of business is at Memphis, Tennessee. Petitioner keeps its books and reports its income on an accrual basis. It filed timely income tax returns for the fiscal years in question with the district director of internal revenue at Nashville, Tennessee.

Petitioner's capital stock consists of 1,000 shares of no-par common stock, all of which is owned by John A. Pace, petitioner's president. Before organizing Mount Vernon, Pace was general sales manager of a cemetery in West Virginia, where he was in charge of sales and administration, including the development and maintenance of the cemetery.

In about December 1953, Vincent B. Rush & Associates, a partnership (hereinafter called Associates), entered into a 38-page contract with petitioner, portions of which may be summarized as follows:

The first few paragraphs of the agreement state that Associates owns part of a farm of 200 acres in Shelby County, Tennessee, called the Tract, and "Upon the terms and conditions and for the considerations hereinafter set forth, Associates agrees to sell and the Company agrees to buy the Tract."

Subsequent paragraphs and subparagraphs of this contract provide that petitioner shall dedicate "all of the Tract" for a cemetery of the "memorial garden type" with each memorial garden to be not in excess of 4 acres in size, and the entire tract to be developed and designed in such manner as to provide for not less than 200,000 burial spaces. The contract goes on for several pages to outline exactly how the cemetery business was to be conducted by petitioner. Petitioner was to employ specific sales programs for the sale of burial lots, called "primary aggregate," "secondary aggregate" and "completed garden aggregate" programs. The contract defines these programs and fixes the sales price of the lots at increased prices from the primary to the completed garden programs. The contract fixes the minimum price per lot which can only be reduced by Associates "in its sole discretion." Petitioner is given the right to permit the lot purchasers to pay in installments, and charge a fee and interest (fixed as not to exceed 5 per cent).

Section 11 of the agreement provided, in part, as follows:

*Section 11.* The Company agrees that (i) it will execute a trust indenture with [a Memphis bank] * * * creating a trust known as the "Mount Vernon Gardens Development Trust Fund" and (ii) in respect of each sale of burial space, it will agree in writing with the purchaser of said burial space to deposit in said development trust fund a specific amount, which amount shall be not less than fifteen percent (15%) of the aggregate amount of said burial space.

    \*      \*      \*      \*      \*      \*      \*

The Company further agrees that the terms of said trust indenture shall provide that said development trust fund shall be expended solely for the physical

development and improvement of the Tract, and that any amount not required for such purposes shall be distributed to and shall constitute a part of the principal of the Mount Vernon Gardens Perpetual Care Trust Fund.

Section 12 provided that petitioner would comply with the requirements and laws of the State of Tennessee, including those regulating the operation of the cemetery property and the creation, funding, and use of a perpetual care trust fund with a minimum deposit to the fund of $15 per burial space or greater, if required by law.[1]

In sections 13 and 14, petitioner agreed to pay Associates 40 per cent of the "basic factor in respect of each burial space sold" (regardless of whether the lot purchaser had completed his installment payments) until such time as 80 per cent of the existent or potential burial spaces in the tract were sold. When the sum resulting from this formula was reached, then *all obligations* of petitioner to Rush under the agreement were to cease.

With respect to delivery to the Company of the deed and possession of the land the contract provides for the delivery of a deed to the Tract to the Company with the deed to contain a vendor's lien covering the tract "reserved and granted in favor of Associates to secure the payment of the deferred considerations and other obligations * * *." Delivery of possession of the Tract to the Company was to be made in parcels "from time to time after the release of the initial twenty-acre parcel" and Associates could refuse to release parcels to the Company if it found such release unnecessary "to the proper and orderly development of the Tract."

The contract provides the Company shall hire "qualified and experienced key men" and develop, improve, and operate a memorial garden cemetery "of the highest standards." In addition to the provisions for the vendor's lien to secure the Company's performance, the contract provides the Company "shall deposit in escrow all of its capital stock, whether issued presently or hereafter, * * * to secure the performance by the Company of all of its obligations to Associates." The terms of the escrow are spelled out in minute detail, and in general give the right to Associates to have the escrowee, in the event of the Company's "default," sell the stock to some qualified buyer who will carry out the Company's obligations under the contract. The contract lists many events which if they occur will constitute a default such as failure of the Company to make sufficient sales of burial lots or a default in the performance by the Company of any of its covenants under the contract that remain unremedied for 30 days after notice thereof.

---

[1] Sec. 46-110, Tennessee Code annotated requires each cemetery corporation to set up and maintain a "permanent improvement fund" equal in amount to 25 per cent of the total gross sum paid by purchasers of lots. Said section further provides that the "interest and income from said permanent fund shall be used * * * for the permanent improvement, upkeep and beautification * * * of the cemetery."

On April 5, 1954, petitioner entered into a trust agreement with a Memphis bank which established the perpetual care fund to comply with the requirements of Tennessee law. This trust agreement, following the language of the pertinent Tennessee statute, provided that the income from the fund be paid to petitioner for the permanent improvement, upkeep, and beautification of existing cemetery facilities but not for the improvement or embellishment of unsold property to be offered for sale.

On August 10, 1952, petitioner entered into a trust agreement with a Memphis bank which established the Mount Vernon Gardens Development Trust Fund. Under this trust agreement petitioner agreed to deposit in the development trust 15 per cent of the sales price of the lots. The development trust agreement further provided, in part, as follows:

2. Amounts deposited with the Trustee * * * and any net income which may be earned thereon shall constitute the [development trust fund] and shall be held, administered and distributed as follows:

(a) Upon the receipt of written instructions of the [petitioner] * * * the Trustee shall from time to time engage the services of such persons, and purchase and pay for such chattels, goods, equipment and services, as the [petitioner] shall certify in said instructions as used, needed or required in the development, improvement and/or beautification of the cemetery property. If, for reasons of convenience and economy, the [petitioner] shall at any time expend its own funds for said purposes, the Trustee shall reimburse the [petitioner] for the amount certified in said instructions as having been so expended.

The trust agreement goes on to provide that upon certification by petitioner to the trustee that development, improvement, and beautification of the cemetery has been completed or that any amount of the development fund is not required in the immediately foreseeable future, the amount in the development fund shall be distributed to the perpetual care fund. The development trust agreement also provided that payments made by the trustee shall be made for the sole purpose of developing, improving, and beautifying petitioner's cemetery land.

In selling burial space to the public, petitioner entered into a written agreement with the purchasers which contained clauses to the effect that it would make the deposits to the perpetual care and development trust funds in accordance with the trust indentures and "cause disbursements to be made from time to time from the Mount Vernon Gardens Development Trust Fund for the purpose of developing and improving Mount Vernon Gardens as provided in the indenture of trust."

In 1954, petitioner employed a landscape architect to prepare plans for the development of the cemetery. The cemetery was planned as a memorial garden type (as compared to a monument type) in which

the entire tract was to be subdivided into a number of smaller parks or gardens. An initial garden was laid out from which sales of burial space could be made and soon several other gardens were laid out and developed.

The bank, trustee of the development fund, was not consulted concerning the plans for the development of the cemetery. The bank trust officer who handled petitioner's development fund had no experience in cemetery development and relied heavily on Pace's knowledge and judgment concerning the development of the cemetery. During the period in question the development of the cemetery included grading, installing underground drainage, building roads and walks, installing waterlines, and planting shrubbery. Payment for this sort of work was either by the trustee from the trust funds upon petitioner's order or directly to the creditor by petitioner. If petitioner paid, it would send a voucher to the trustee who would then reimburse petitioner. Occasionally the trustee questioned the purpose of an expenditure, but normally payments to creditors or reimbursement to petitioner for such payments were automatic.

Petitioner began selling burial spaces in January 1954. Its sales policy was to sell about one-third of the available burial spaces in a garden, then discontinue sales from that garden and begin sales programs for other gardens. As the burial spaces in the gardens were sold, petitioner developed and improved the gardens in the manner indicated above. At the date of trial, petitioner had developed about 5 gardens and had sold burial space in about 13.

The sale of burial space accounted for most of petitioner's sales and profits. Additional amounts were received from the sale of grave markers and charges for burial services. Fifteen per cent of the receipts from the sale of burial spaces was deposited in the development trust fund.

In its income tax returns for the taxable years ended October 28, 1954, and October 27, 1955, petitioner did not include in its income amounts which were turned over to the trustee of the development trust fund in those years. Respondent, in the statutory notice, included in petitioner's income $60,016.75 for the taxable year ended October 28, 1954, and $87,362 for the taxable year ended October 27, 1955. It is stipulated these amounts represented the 15 per cent of gross sales turned over to the trustee of the development fund. Respondent did not include in petitioner's income any amounts deposited in the perpetual care fund.

In March 1958, petitioner filed claims for refund of taxes paid in its fiscal years 1954 and 1955 based on net operating loss carrybacks from the year 1957. Respondent disallowed these claims and petitioner incorporated them in this action by amended petition.

OPINION.

Petitioner seeks to exclude from its gross income the portion of the sales price of cemetery lots which went into its development trust fund. Petitioner relies upon cases where it has been held the portion of sales price of cemetery lots which went into a perpetual care fund, pursuant to a statute or binding agreement with lot purchasers, could be excluded from gross income. Such cases are not in point here. There are several decisions of this and other courts which, taken together, establish a rule that where a fund is established by contributing a per cent of sales price of cemetery lots to a fund and the fund is to be devoted to expenditures for expenses and improvements consistent with establishing and carrying on the cemetery enterprise, the amounts that go into the said fund will be gross income to the cemetery. *Memphis Memorial Park*, 28 B.T.A. 1037, affirmed per curiam 84 F. 2d 1008; *National Memorial Park* v. *Commissioner*, 145 F. 2d 1008, affirming a Memorandum Opinion of this Court; *Gracelawn Memorial Park* v. *United States*, 260 F. 2d 328.

Petitioner, in its reply brief, points to certain factual distinctions between the above-cited cases and the instant case, such as the absence of a trust in *Memphis Memorial Park*, *supra*, and the absence of a specific obligation to lot purchasers in *National Memorial Park* v. *Commissioner*, *supra*, and the use of the fund for the acquisition of land and erection of buildings in *Gracelawn Memorial Park* v. *United States*, *supra*. Petitioner points to its carefully drawn trust instrument, its contractual obligation to lot purchasers to deposit at least 15 per cent of the sales price in the development trust fund, and the fact that the trust funds could only be used in the "development, improvement and/or beautification of the cemetery property." Such factual differences are immaterial. The rule to be drawn from the cited cases, that amounts which go into such a development fund must be included in gross income of the cemetery business, is grounded upon the fact that the cemetery is the primary beneficiary of such a fund.

The big distinction which petitioner sees between this case and the three cited cases is that in those cases the fund was voluntarily established by the taxpayer while here the establishment of the trust fund was "imposed" upon petitioner. The following paragraph from petitioner's brief states his argument on this point:

The third important respect in which the instant case differs from those cases is that here the petitioner acquired its property subject to the obligation to establish the Development Trust Fund and to make the required payments into the fund. This obligation was imposed upon the petitioner, contrary to the wishes of its president, by Associates. Petitioner could not have acquired the land without assuming the obligation, and failure to comply therewith would subject petitioner to foreclosure of the vendor's lien retained by Associates.

In our findings we have summarized portions of this 38-page contract between petitioner and Associates. While it bristles with the emphatic language of a binding agreement between strangers, it really amounts to no more than a convenient compact between parties who were entering the cemetery business as a joint venture or enterprise. This is made manifest by the provisions of the contract whereby Associates was to contribute its land, and petitioner, its time, skill, and effort for the common purpose of developing a cemetery and selling cemetery lots with the parties to share in the proceeds from the sale of lots. "The relation of joint adventurers is created, generally speaking, when two or more persons combine their property, money, efforts, skill, or time in some common undertaking." *Frank R. Bavis*, 18 T.C. 418, 433. See also *Aryton Metal Co.*, 34 T.C. 464. We need not make a finding as to the exact relationship between petitioner and Associates. It is enough that the development fund was for the primary benefit of the cemetery business on which petitioner is reporting gross income. It is not made of less benefit to the cemetery business by petitioner's performance contract with another who has a stake in its successful operation. Petitioner's argument that it was compelled to set up the trust and make contributions of portions of the sale price of lots to the fund by virtue of the contract with Associates is entirely irrelevant. The question is whether the cemetery business was the prime beneficiary of the fund. Whether the compulsion to set up the fund was a consideration of "sound business policy" (*Memphis Memorial Park, supra*) or a contract with one who will share in the cemetery enterprise is of no interest.

We conclude that the portion of the sales price of lot sales which went into the development trust fund was properly a part of petitioner's gross income.

Petitioner makes an alternative argument to the effect that any amounts paid into the development trust fund in a certain year must be included in petitioner's cost of property sold that year. Here again reliance is upon the contract with Associates. The argument is that petitioner's basis in a lot it sells is the amount it must pay under the contract to Associates plus the amount it has to pay to the trustee of the development trust fund from the sales price of the lot.

There is no essential difference between the argument here advanced and petitioner's first argument that the payments to the development trust fund were excludible from gross income because the contract with Associates "imposed" such payments on petitioner.

It is clear that, outside the contract, petitioner in the sale of its lots for a certain year would not be entitled to any blanket addition

to costs by reason of payments to the development fund during said year. The fact that the payments to the development fund were made by petitioner under compulsion of the contract with Associates is immaterial. In short, additions to cost basis of lots sold by reason of expenditures for development and improvements will not be governed by a contract between those who will share the profits of the sale.

The rule for the addition to cost basis of the expenditures for cemetery development or improvement expenses is set forth in *National Memorial Park* v. *Commissioner, supra*, as follows:

He [Commissioner] adopted as the basis for the cost of each year's sales the cost of the land plus cost of land improvement allocated proportionately to the square feet of land in the lots sold. The Tax Court agreed with this method and we think the Tax Court was correct.

Petitioner argues that, if the above rule is to be followed, then its cost of property sold should include estimated future expenditures for the development of the property. The argument is foreclosed by what we said in *Memphis Memorial Park, supra:* "Nor do we think that petitioner's estimate of the cost of the contemplated improvements should be added to the cost of the plots in advance of expenditures made therefor."

In the last-cited case the lot sales contracts mentioned certain improvements the cemetery was to make but we pointed out the cemetery was "bound for no specified expenditure" and it was not bound to abide by any plan of improvements and "the plans, and the amount of the expenditures, might be changed at will."

Petitioner had plans for improvements in the instant case and cost estimates of such improvements of a landscape architect, based on present day prices, of a minimum of $2,757,944 and a maximum of $3,984,962.40. Petitioner argues it was bound by its plan and the estimated expenditures therefor because of the obligations under the provisions of its contract with Associates wherein it was required to develop and operate a memorial garden cemetery of the "highest standards." From this petitioner concludes *Memphis Memorial Park, supra*, is distinguishable. The argument of petitioner on brief is: "The minimum estimate constitutes a statement by a qualified architect of the minimum amount which must be spent, if petitioner was and is to comply with its contractual obligation to Associates * * * [and] * * * limited by this contractual obligation, petitioner could not reduce at will the amount of its expenditures below the minimum required to develop a cemetery of the highest standards."

We doubt the sufficiency of the evidence to show a binding obligation even to Associates for any specific plan or expenditure for development but in any event we have heretofore pointed out the in-

firmity of this contract with Associates to establish obligations which will have reality for petitioner's tax computation. The same infirmity exists here. Such a contract between parties who are to share in the business profits furnishes no binding obligation as to contemplated future development expenditures such as would warrant the estimate thereof being included in cost of lots sold. The issue is ruled by *Memphis Memorial Park, supra.* No estimate of cost of contemplated improvements should be added to the cost of lots sold during the years in question.

The parties, by stipulation, settled possible issues as to petitioner's right to refund (based on possible operating loss carrybacks from subsequent years) in the event we held petitioner was correct in excluding from gross income the sums which went into the development trust fund. Since we have held petitioner was not correct in such exclusion, petitioner is not entitled to any refund. We hold for respondent.

*Decision will be entered under Rule 50.*