**MOUNT VERNON GARDENS, INC.,
Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 14481.**

United States Court of Appeals
Sixth Circuit.

Feb. 9, 1962.

Charles W. Davis, Chicago, Ill. (John C. Walker, Chicago, Ill., Samuel H.

Horne, Washington, D. C., on the brief), for petitioner.

Carolyn R. Just, Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Lee A. Jackson, Harry Baum, Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before MILLER, Chief Judge, O'SULLIVAN, Circuit Judge, and DARR, Senior District Judge.

SHACKELFORD MILLER, Jr., Chief Judge.

Petitioner, Mount Vernon Gardens, Inc., seeks a review of the decision of the Tax Court determining deficiencies in income taxes of the petitioner for the taxable years ended October 28, 1954, and October 27, 1955.

The facts, which for the most part are not in dispute, are as follows.

Petitioner is a cemetery corporation organized for profit in 1952 under the laws of Tennessee. It keeps its books and reports its income on the accrual basis. About December 1953 Vincent B. Rush & Associates, a partnership, hereinafter called "Associates," entered into a lengthy contract with petitioner, portions of which are summarized as follows.

Associates agreed to sell and the petitioner agreed to buy a 200-acre tract of land in Shelby County, Tennessee, owned by Associates and referred to therein as the Tract, upon certain terms and conditions as follows. Petitioner agreed to dedicate all of the Tract for a cemetery of the "memorial garden type" with each memorial garden to be not in excess of 4 acres in size, and the entire tract to be developed and designed in such manner as to provide for not less than 200,000 burial spaces.

Petitioner agreed to execute a trust indenture creating a trust to be known as the "Mount Vernon Gardens Perpetual Care Trust Fund" and to agree in writing with each purchaser of burial space to deposit in said perpetual care trust fund a specific amount, to be either $15.00 per burial space or the amount re-

quired by the laws of the state of Tennessee, whichever was greater.

Section 11 of the Agreement provided in part as follows:

"Section 11. The Company agrees that (i) it will execute a trust indenture with (a Memphis bank) * * * creating a trust to be known as the "Mount Vernon Gardens Development Trust Fund" and (ii) in respect of each sale of burial space, it will agree in writing with the purchaser of said burial space to deposit in said development trust fund a specific amount, which amount shall be not less than fifteen percent (15%) of the aggregate amount of said burial space.

    *    *    *    *    *    *

"The Company further agrees that the terms of said trust indenture shall provide that said development trust fund shall be expended solely for the physical development and improvement of the Tract, and that any amount not required for such purposes shall be distributed to and shall constitute a part of the principal of the Mount Vernon Gardens Perpetual Care Trust Fund."

Petitioner agreed to pay Associates 40% of the "basic factor in respect of each burial space sold by it" until 80% of the existent or potential burial spaces in the tract was sold, at which time all obligations of the petitioner to Associates under the contract would cease. The definitions of "basic factor" and other terms show that 40% of the basic factor was the equivalent of 30% of the aggregate amount with respect to the sale of burial space.

Associates retained a vendor's lien on the tract, with parcels to be released from the lien from time to time. In the event of a default petitioner agreed to reconvey so much of the Tract as remained subject to the vendor's lien, but until default and written notice thereof, petitioner was to have possession of the Tract.

In order to insure the development, improvement, maintenance and operation of a memorial garden cemetery of the highest standards and thereby insure the ultimate payment in full of all amounts payable to Associates, the petitioner agreed to employ a sufficient number of qualified and experienced key men to form and maintain a management competent to achieve such standards.

Other provisions of the contract required the deposit of all of petitioner's capital stock in escrow, to be sold, in case of default, to some qualified buyer who would carry out petitioner's obligations under the contract. It placed limitations on petitioner's incurring of indebtedness and on its encumbering or transferring its assets, and specified what would constitute events of default.

Pursuant to its contract, petitioner on April 5, 1954, entered into a trust agreement with The First National Bank of Memphis, Tennessee, as trustee, establishing the Mount Vernon Gardens Perpetual Care Trust Fund, into which would be deposited 25% of the aggregate sums payable by purchasers of burial space. This trust agreement provided that the income from the Fund be paid to petitioner for the permanent improvement, upkeep and beautification of its cemetery, and for no other purpose, and that it should never be used for the improvement or embellishment of unsold property to be offered for sale. It is not contended by the Commissioner that the payments made into this fund constituted taxable income, and such payments are not involved in this litigation.

Pursuant to its contract, petitioner on August 10, 1954, entered into a trust agreement with The First National Bank of Memphis, as trustee, establishing the Mount Vernon Gardens Development Trust Fund. The payments made by petitioner into this trust fund present the issue in the present case.

Under this trust agreement petitioner agreed to deposit in the Development Trust 15% of the sales price of the lots. It further provided:

"2. Amounts deposited with the Trustee * * * and any net income which may be earned thereon

shall constitute the (development trust fund) and shall be held, administered and distributed as follows:

"(a) Upon the receipt of written instructions of the (petitioner) * * the Trustee shall from time to time engage the services of such persons, and purchase and pay for such chattels, goods, equipment and services, as the (petitioner) shall certify in said instructions as used, needed or required in the development, improvement and/or beautification of the cemetery property. If for reasons of convenience and economy, the (petitioner) shall at any time expend its own funds for said purposes, the Trustee shall reimburse the (petitioner) for the amount certified in said instructions as having been so expended."

This trust agreement also provided that upon certification by the petitioner to the trustee that development, improvement, and beautification of the cemetery had been completed or that any amount of the Development Fund was not required in the immediately foreseeable future, the amount in the Development Fund should be distributed to the Perpetual Care Fund. It also provided that payments made by the trustee should be made for the sole purpose of developing, improving, and beautifying the described cemetery land.

During the latter part of 1953 petitioner employed a landscape architect to prepare plans for the development of the cemetery. The cemetery was planned as a memorial garden type (as compared to a monument type) in which the entire tract was to be subdivided into a number of smaller parks or gardens. An initial garden was laid out from which sales of burial space could be made. Thereafter, other gardens were laid out and developed. During the period in question, the development of the cemetery included grading, installing underground drainage, building roads and walks, installing waterlines, and planting shrubbery. Payment for this sort of work was either

by the trustee from the Trust Fund upon petitioner's order or directly to the creditor by the petitioner. If the petitioner paid, it would send a voucher to the trustee, who would then reimburse petitioner. Occasionally the trustee questioned the purpose of an expenditure, but normally payments to creditors or reimbursement to petitioner for such payments were automatic.

Petitioner began selling burial space in January 1954. Its sales policy was to sell about one-third of the available burial space in a garden, then discontinue sales from that garden and begin sales programs for other gardens. As burial spaces in gardens were sold, petitioner developed and improved the gardens in the manner indicated.

In connection with the sale of burial space, petitioner entered into a written Sale Agreement with the purchaser, under which it agreed to make deposits to the Development Trust Fund and the Perpetual Care Trust Fund in accordance with the allocation therein agreed upon. Most sales were made on the installment basis. The Sale Agreement specified the manner in which each payment received by the petitioner should be allocated among the Development Trust Fund, the Perpetual Care Trust Fund and petitioner, in accordance with its contract with Associates. All receipts allocable to the Development Trust Fund were promptly paid in full by petitioner to the trustee of the trust fund.

The landscape architect, who had previous experience with other cemeteries, gave a detailed estimate of the cost for the complete development of the cemetery, from the beginning to the end. The minimum development cost of a "first-class type of cemetery" was estimated to be $2,757,944.00. He estimated the maximum development cost at $3,984,962.40. He estimated that the Tract would yield only some 167,000 burial spaces, instead of the 200,000 originally planned. On this minimum basis he estimated an average development cost of $16.03 per burial space. There was no

contradictory evidence on this phase of the case.

In its income tax returns for the years in question, petitioner did not include in its income 40% of the aggregate sums with respect to burial space sold during such taxable years. This 40% represented 25% allocable to the Perpetual Care Trust Fund and 15% allocable to the Development Trust Fund. Respondent, in the statutory notice, included in petitioner's income $60,016.75 for the taxable year ended October 28, 1954, and $87,362.00 for the taxable year ended October 27, 1955. These amounts represented the 15% of gross sales allocable to the Development Fund. Respondent did not include in petitioner's income any amounts allocable to the Perpetual Care Fund.

Petitioner contends that the portion of the sales price of lot sales which was allocable to the Development Trust Fund was not properly a part of petitioner's gross income. It makes the alternative argument that if these amounts are included as part of its gross income, the same amounts allocable to the Development Trust Fund in a certain year must be included in the cost of the property sold that year, or, in any event, there should be included in the cost of each burial lot its allocable portion of the actual and estimated costs for development of the cemetery. The Tax Court rejected all of these contentions. Mount Vernon Gardens, Inc. v. Commissioner, 34 T.C. 598.

In making its ruling the Tax Court relied mainly upon Memphis Memorial Park v. Commissioner, 28 B.T.A. 1037, affirmed, 84 F.2d 1008, C.A. 6th; National Memorial Park v. Commissioner, 145 F.2d 1008, C.A. 4th, and Gracelawn Memorial Park, Inc. v. United States, 260 F.2d 328, C.A. 3rd. It is clear from these cases that the entire amount received from the sale of a cemetery lot is to be treated as gross income in the absence of a binding obligation on the part of the cemetery requiring a portion of the purchase price to be used for the benefit of the lot owner. As pointed out by the Board of Tax Appeals in the Memphis Memorial Park case, there is ample authority for the proposition that under certain conditions a part of the purchase price received upon trust or under such a binding obligation is to be excluded from gross income. Examples of this are found in trusts the income from which is required to be used for the perpetual care of the cemetery lots which are sold. Troost Ave. Cemetery Co. v. United States, 21 F.2d 194, W.D.Mo.; American Cemetery Co. v. United States, 28 F.2d 918, D.C.Kansas; Commissioner of Internal Revenue v. Cedar Park Cemetery Association, 183 F.2d 553, 556–557, C.A. 7th. But the creation of a trust into which a portion of the purchase price is paid is not in and of itself sufficient to prevent the trust money from being treated as income. As the opinions in the National Memorial Park and Gracelawn Memorial Park cases, supra, point out, the decisive feature in each case is the terms and provisions of the particular trust involved. The questions of control by, and inurement to the benefit of, the taxpayer, are of prime importance. In each of those cases the Court was of the opinion that the trust funds were available under the terms of the trust to promote future capital improvements in the taxpayer's property, was for the taxpayer's benefit, and accordingly was taxable income. It was pointed out in the National Memorial Park case that any increase in the value of the unsold lots, through permanent capital improvements, was a direct benefit to the cemetery company. We think that is the situation in the present case.

In the present case, as in those cases, no attempt has been made by the Commissioner to tax as income the payments required to be made by the petitioner into the trust for perpetual care of the lots sold. Cases relied upon by petitioner holding such funds nontaxable as income are not applicable to our present problem. In Lashells' Estate v. Commissioner, 208 F.2d 430, C.A. 6th, relied upon by petitioner, the taxpayer was a mere conduit for the funds received by him and passed

on to another and the absence of economic benefit to the taxpayer was sufficient to prevent the funds in question from being treated as taxable income. In Seven-Up Company v. Commissioner, 14 T.C. 965, also relied upon by petitioner, the funds received by the taxpayer were not for services rendered or to be rendered nor as part of the purchase price for the syrup being sold by the taxpayer. They were contributions made by the purchasers, in addition to the purchase price, to the taxpayer as their agent, to be expended for advertising in their behalf. They did not constitute earnings under a claim of right by the taxpayer and, accordingly, did not constitute income.

■ We agree with the rulings in the cemetery cases above referred to on this phase of the case and are of the opinion that the Tax Court was not in error in holding that the portion of the sale price of each lot which was allocated to the Development Trust Fund was properly a part of petitioner's gross income.

In holding, contrary to the contention of the petitioner, that the amounts allocable to the Development Trust Fund could not be included in the cost of the property sold, the Tax Court was of the opinion that although the cost of improvements actually made upon cemetery property could be added to the cost of the property sold, the estimated cost of "contemplated improvements" could not be so added. It relied mainly upon the rulings in the Memphis Memorial Park and National Memorial Park cases, supra, that under the circumstances existing in those cases the cemetery companies were not obligated to make any specific improvements either in kind or amount. The Commissioner seeks to uphold this ruling on the theory that under settled tax accounting principles, items may be accrued and offset against gross income only in the taxable year in which the liability to pay becomes fixed, both in fact and in amount; that a contractual obligation to incur an expense in the future does not give rise to an accrued deductible expense until the taxpayer actually incurs the expense. Spencer,

White & Prentis v. Commissioner, 144 F.2d 45, C.A. 2nd, cert. denied 323 U.S. 780, 65 S.Ct. 269, 89 L.Ed. 623; Security Flour Mills Co. v. Commissioner, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725; Brown v. Helvering, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725; New Capital Hotel v. Commissioner, 261 F.2d 437, C.A. 6th.

■ It has been consistently held that the cost of improvements to subdivided real estate held for sale is a capital expenditure, allocable to the basis of the various unsold lots, to be realized by the developer upon his ultimate sale of the property. The cost of each lot for the purposes of determining gain or loss includes a pro rata portion of payments made for permanent improvements to the subdivision as a whole for the benefit of the lots to be sold, such as construction of streets and drives, construction of a sewer disposal system, and the cost of securing an extension of gas and electricity service to the subdivision. Merten's Federal Income Taxation, Vol. 3A, Section 21.14, main volume and cumulative supplement; Commissioner of Internal Revenue v. Laguna Land & Water Co., 118 F.2d 112, 117–118, C.A. 9th; Birdneck Realty Corporation, 25 B.T.A. 1084, 1090; Cambria Development Co., 34 B.T.A. 1155; Estate of M. A. Collins, 31 T.C. 238, 255–257; The Colony, Inc., 26 T.C. 30, 47–48, affirmed on other grounds 244 F.2d 75, C.A. 6th, reversed on other grounds, 357 U.S. 28, 78 S.Ct. 1033, 2 L.Ed.2d 1119; Country Club Estates, Inc., 22 T.C. 1283, 1293; Albert Gersten, 28 T.C. 756, 766–767; Frank B. Cooper, 31 T.C. 1155, 1157; Wood v. Commissioner, 245 F.2d 888, 896, C.A. 5th; Woodside Mills v. United States, 260 F.2d 935, 936, C.A. 4th. This principle is applicable to a tract of land developed for cemetery purposes and the sale of burial lots therein. Commissioner of Internal Revenue v. Cedar Park Cemetery Association, 183 F.2d 553, 557–558, C.A. 7th.

■ We are of the opinion that the above rule is applicable in the present

case and that the amounts allocable to the Development Trust Fund should be added to the cost basis of the lots being sold, even though such improvements have not yet been contracted for or made. The estimated cost of the improvements has been given, the correctness and reasonableness of which has not been challenged. In so far as the taxpayer is concerned, these funds have been impressed with an irrevocable trust to be used for such improvements and will never revert to the taxpayer. It is more than a contingent liability or a liability to accrue in the future. The taxpayer has legally parted with these funds, the amount is definitely fixed. The fact that the exact manner in which the money will be spent has not been decided upon does not, in our opinion, alter the fact that the taxpayer has become legally and irretrievably bound for improvement expenses of the nature agreed upon and in a definitely fixed amount. Since it is on an accrual basis the expense has accrued, although it has not yet been paid. We think the ruling is supported by numerous decisions.

In Birdneck Realty Corporation, supra, 25 B.T.A. 1084, 1090, the Court said, "The inclusion in cost of an estimated future expenditure on the development of tracts of land from which lots are sold has been recognized by the Board as proper. (citing cases.)" In Cambria Development Co., supra, 34 B.T.A. 1155, 1157, the Court said, "It is well established that as a matter of law the petitioner has the right to include in its costs such estimated future expenditures for the development of the property as required by its contracts of sale. (citing cases.)" In The Colony, Inc., supra, 26 T.C. 30, 44; 244 F.2d 75; 357 U.S. 28, 78 S.Ct. 1032, 2 L.Ed.2d 1119, the Tax Court said, "It is well established that where subdivision lots are sold before development work is completed, the seller may include in his costs of the lots an allocation of his estimated future expenditures for improvements to the subdivision." See also: County Club Estates,

Inc., supra, 22 T.C. 1283, 1294; Hilinski v. Commissioner, 237 F.2d 703, 705, C.A. 6th; Harrold v. Commissioner, 192 F.2d 1002, C.A. 4th; Milwaukee & Suburban Transport Corp. v. Commissioner, 283 F.2d 279, 286–288, C.A. 7th.

■ In applying the foregoing rule, the cost of the improvements should be equitably apportioned to the several lots and the gain or loss computed on each lot or parcel sold, treating the sale of each lot as a separate transaction. Merten's Federal Income Taxation, Vol. 3A, Section 21.14.

The decision of the Tax Court is reversed and the case remanded for further proceedings consistent with the views expressed herein