**JEFFERSON MEMORIAL GARDENS, INC., Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 24773.

United States Court of Appeals
Fifth Circuit.

Jan. 30, 1968.

Rehearing Denied March 7, 1968.

income tax deficiency assessments [1] against Jefferson Memorial Gardens, Inc. (hereinafter petitioner or taxpayer) for the years 1957, 1958, and 1959. There are two questions for decision: first, whether petitioner is entitled to a higher acquisition basis on certain real estate acquired by it for use in the cemetery business; and second, whether petitioner is entitled to exclude from its gross income certain installment receipts representing partial satisfaction of the sales prices of grave spaces and grave markers. The facts are not in controversy, having been stipulated by the parties.

Petitioner is an Alabama corporation formed on August 25, 1952 to operate a cemetery in Jefferson County, Alabama. At all times it had authorized capital stock of 2,000 shares of common with a par value of $1.00 per share. Petitioner keeps its books and files its Federal income tax returns on the basis of a calendar year using the accrual method of accounting while reporting income from sales of cemetery spaces and markers under the installment method.

Petitioner was formed by Messrs. Meyer, Bone, Braverman and McCord.[2] To provide land necessary for the cemetery, McCord acquired two tracts of real estate which he later conveyed to petitioner.[3] In exchange for this property, McCord received 400 "certificates of indebtedness" [4] issued by petitioner which en-

Jacquin D. Bierman, Chase & Bierman, New York City, for petitioner.

Lester R. Uretz, Chief Counsel, I.R.S., Richard P. Milloy, Atty., I.R.S., Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Jonathan S. Cohen, Willy Nordwind, Jr., Attys., Dept. of Justice, Washington, D. C., for respondent.

Before COLEMAN and SIMPSON, Circuit Judges, and DAWKINS, District Judge.

BEN C. DAWKINS, JR., District Judge:

Presented here is a petition for review of a decision of the Tax Court upholding

---

1. Timely deficiency assessments were made against taxpayer as follows:

| Calendar Year Ended | Tax | Total Assessment |
| --- | --- | --- |
| December 31, 1957 | $29,083.78 | $29,083.78 |
| December 31, 1958 | 14,825.53 | 14,825.53 |
| December 31, 1959 | 6,937.37 | 6,937.37 |
| Total Deficiency | | $50,846.68 |

---

2. In passing we note that one of the organizers of petitioner, Fred Meyer, Jr., has been actively engaged in the commercial cemetery business all over the United States for seventen years and is well known in the cemetery trade.

3. Only one of the tracts acquired by McCord and transferred to petitioner was

actually used in the business. McCord paid $40,000 for this particular tract.

4. The term "certificates of indebtedness" was used by petitioner to describe the securities issued to McCord and others. The Tax Court found, and petitioner agreed, that these securities did not evidence indebtedness but were equity interests in the business.

titled McCord to a 40% interest in the proceeds from the business pursuant to specific terms of the certificates. Some 600 additional certificates were issued to relatives and associates of Meyer, Bone and Braverman but petitioner received no consideration of any kind from any of these persons.

For income tax purposes, petitioner treated the amounts due on the certificates as the cost of the land. However, the Commissioner ruled that the transaction was a non-taxable exchange pursuant to Section 112(b) (5) of the Internal Revenue Code of 1939. Therefore the basis for the property actually used in the business was the transferor's (McCord's) cost or $40,000. This valuation by the Commissioner was affirmed by the Tax Court.

As part of its business activities, petitioner sold grave spaces and grave markers on a "pre-need" basis whereby customers would purchase spaces and/or markers on a "pay now—use later" plan. As each grave space sales contract was executed, petitioner would exclude 15% of the sales price from its gross income, this being treated as a portion of the cost of goods sold. The figure of 15% was designated in the sales contracts for future use in cemetery development. As each grave marker contract was executed, petitioner would deduct the manufacturer's list price for that type of marker on its income tax return for the year in question, again as a part of costs of goods sold. In other words, petitioner was making these exclusions from income prior to incurring actual expenditure of the designated funds.[5]

It was petitioner's contention that this method of accounting was the best method actually to match revenues with costs. The Commissioner disagreed, and refused to allow these exclusions until the anticipated expenditures actually were incurred. This position was affirmed by the Tax Court. (That Court's decisions are not officially reported.) Having the facts before us, we move to the merits of the issues presented for decision.

## I.

### Basis of the Land

■ As previously mentioned, the Commissioner found that the land transaction was governed by Section 112(b) (5)[6] of the 1939 Internal Revenue Code, and therefore decided that petitioner's basis for the land was $40,000. Although there was no specific finding on this issue in its opinion, the Tax Court apparently affirmed the Commissioner's valuation. We reverse and remand on this question for the following reasons.

Petitioner contends that Section 112 (b) (5) of the 1939 Code is inapplicable to the transfer in question because the amount of stock received by McCord was not "substantially in proportion to his interest in the property prior to the exchange" as required by the statute. This position is taken because in transferring the property McCord received 400 certificates of indebtedness representing 40% of the certificates issued, whereas prior to the exchange he was 100% owner of the property. Thus petitioner argues that the "substantial proportion" provision of § 112(b) (5) has not been met. We agree.

It is well settled that in order for this section of the 1939 Code to be applied, the substantial proportion requirement must be met. In one instance it was held

5. Some of the problems encountered in this area have been recently discussed. See Aland, Prepaid Income and Estimated Future Expenses: Is a Legislative Solution Needed? 54 A.B.A.J. 84 (1968).

6. Int.Rev.Code of 1939, § 112(b) (5) provides in part:
"No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange."

that a variation of as little as 3½% was disproportionate.[7] Other cases have held similarly and do not require further elaboration.[8]

Because it was "clearly erroneous" to sustain the Commissioner's original position concerning applicability of § 112 (b) (5), we reverse the Tax Court on this point, and remand for further evidence to be taken, as hereinafter indicated.

In this appeal the Commissioner has taken an entirely new tack, contending that petitioner's basis for the land is $40,000 regardless of the applicability of § 112(b) (5). Thus the Commissioner argues that where securities of the issuing corporation have no readily ascertainable independent fair market value when issued, the issued stock is assigned a value equivalent to the fair market value of the assets acquired in the exchange.[9] Applying that well established principle to this case, the Commissioner now urges, for the first time on appeal, that the securities or certificates issued by petitioner had no readily ascertainable independent value, and therefore the purchase price of the land paid by McCord, $40,000, must be assigned to the certificates. We do not agree that this principle is necessarily applicable to this case.

▮▮ We are fully aware that a decision by the Tax Court may be affirmed on a different theory of law from that relied on in the lower court. However, where such a theory has no basis in the record made up below, the taxpayer is entitled to a hearing to establish additional facts which might affect the result.[10] After exhaustively reviewing the record in this case, we conclude that there is no basis presently in the record upon which the Commissioner's new theory may be supported. No evidence was offered tending to prove the value of the certificates in question. We express no opinion whether such a value can be established, but taxpayer is entitled to that opportunity in view of the change of position on appeal, adopted by the Commissioner, which is completely dependent upon a factual determination, namely, that these certificates do not have an independently ascertainable value. We therefore remand upon this issue to afford petitioner the factual hearing to which it is entitled.

## II.

### Excludability of Receipts from Gross Income

On this point petitioner, in essence, contends that certain amounts received from sales of grave spaces and markers are excludable from gross income because such receipts represent a return of capital investment and are not subject to income tax. To support its position, petitioner has cited a wealth of constitutional landmarks holding that the government constitutionally may not levy an income tax on gross receipts but must limit its tax so as to affect only gross income.[11] We are certain that no one, including the Commissioner, disagrees with this well established principle of law. Nevertheless, the more difficult task confronting us here is an initial determination of whether these receipts represent income or a return of capital as contended by petitioner.

It asserts that in the sales contracts for the grave spaces, it covenanted to dedicate 15% of the sales price of each plot to *future* cemetery development. Moreover, petitioner points out that these receipts were so allocated in its bookkeeping entries. It also had exhaustive engineering studies made prior

---

7. Bodell v. Commissioner of Internal Revenue, 154 F.2d 407 (1st Cir. 1946).

8. See Mather & Co. v. Commissioner of Internal Revenue, 171 F.2d 864 (3d Cir. 1949); United Carbon Co., 32 B.T.A. 1000, reversed 90 F.2d 43 (4th Cir. 1937); Cyrus Eaton, 37 B.T.A. 715 (1938); Edwin L. Dana, 36 B.T.A. 231 (1937).

9. Brief for the Respondent, pp. 17–18 and the authorities cited therein.

10. Helvering v. Gowran, 302 U.S. 238, 58 S.Ct. 154, 82 L.Ed. 224 (1937).

11. Brief for the Petitioner, pp. 15–16.

to construction which included estimated costs of developing the cemetery. The correctness of these estimated costs is unchallenged.

Also to be considered is the fact that properly documented estimated expenditures are excludable in ordinary real estate developments every day and courts consistently have applied these principles to the cemetery business. Prior to decision of this important issue, we recognize the following basic principles.

■ It consistently had been held that properly estimated costs of improvements to subdivided real estate is a capital expenditure allocable to the basis of the various unsold lots to be recovered by the developer upon his ultimate sale of the lots.[12] It also has been held that this principle is applicable to a tract of land developed for cemetery purposes and the sale of burial lots therein.[13] However, without exception, it has been the long-standing rule that where a fund is established by attributing a percentage of the sales price of cemetery lots, and the fund is to be devoted to future development and improvement, the amounts going into the fund will constitute gross income to the cemetery developer.[14] There are two recognized exceptions to this rule: first, where there is a definitely established trust for the development fund;[15] and second, where a segregated fund is required, under a specific agreement with the lot purchasers, which actually binds the developer to make specific improvements.[16]

Proper interpretation and application of the trust fund exception has been astutely articulated by our brothers of the Sixth Circuit in Mount Vernon Gardens, Inc. v. C.I.R., supra, as follows:

"As [prior] opinions * * * point out, the decisive feature in each case is the terms and provisions of the particular trust involved. *The questions of control by, and inurement to the benefit of, the taxpayer, are of prime importance.*" (298 F.2d 712, 716. Emphasis added.)

■ A similar position was adopted earlier by this Court in Metairie Cemetery Association v. United States, supra, where we held:

"A cemetery association may exclude from income deposits paid to it by burial lot owners, *if it can show that the deposits are received in trust and that the principal and income therefrom cannot inure to its benefit.*" (282 F.2d 225, 229, 230. Emphasis added.)

■ Regardless of establishment of a formal trust fund, the same principles are applicable to a case, as in the second exception to the general rule, where a segregated and protected development fund is specifically required. From authorities cited above, the validity of petitioner's claim on this issue turns upon whether such funds, received from advance sales of grave spaces and markers, and excluded from gross income, actually were managed in such manner that the use thereof could not inure to petitioner's benefit. Because petitioner did not

---

12. Willow Terrace Development Co. v. C. I. R., 345 F.2d 933 (5th Cir. 1965); C. I. R. v. Laguna Land & Water Co., 118 F.2d 112 (9th Cir. 1941); Butler-Fornari Realty Corp. v. C. I. R., 37 B.T.A. 933 (1938); Cambria Development Co. v. C. I. R., 34 B.T.A. 1155 (1936); Birdneck Realty Corp. v. C. I. R., 25 B.T.A. 1084 (1932).

13. Mount Vernon Gardens, Inc. v. C. I. R., 298 F.2d 712 (6th Cir. 1962); C. I. R. v. Cedar Park Cemetery Ass'n, 183 F.2d 553 (7th Cir. 1950).

14. Sherwood Memorial Gardens, Inc. v. C. I. R., 350 F.2d 225 (7th Cir. 1965); Mount Vernon Gardens, Inc. v. C. I. R., 298 F.2d 712 (6th Cir. 1962); Gracelawn Memorial Park, Inc. v. United States, 260 F.2d 328 (3d Cir. 1958); National Memorial Park v. C. I. R., 145 F.2d 1008 (4th Cir. 1944); American Cemetery Co. v. United States, 28 F.2d 918 (D.C.Kan.1928).

15. See Mount Vernon Gardens, Inc. and Cedar Park, supra.

16. Monte Vista Burial Park, Inc. v. United States, 340 F.2d 595 (6th Cir. 1965); Metairie Cemetery Ass'n v. United States, 282 F.2d 225 (5th Cir. 1960); C. I. R. v. Cedar Park Cemetery Ass'n, 183 F.2d 553 (7th Cir. 1950).

establish a trust for future development here, it must prove that a specific agreement existed with burial lot owners to establish a development fund is specifically required. From the authorities cited above, the validity of petitioner's claim on this issue turns upon whether such funds, received from advance sales of grave spaces and markers, and excluded from gross income, actually were managed in such manner that the use thereof could not inure to petitioner's benefit. Because petitioner did not establish a trust for future development here, it must prove that a specific agreement existed with burial lot owners to establish a development fund. Moreover, petitioner must show that this fund was for the benefit of the burial lot purchasers and not for petitioner's unrestricted use.

Here, the evidence clearly shows that petitioner had very complete, detailed engineering studies conducted which accurately reflected the estimated costs of developing the cemetery in question. In addition it has been established that sales contracts executed by taxpayer with plot purchasers contained a development clause reading:

"(3) DEVELOPMENT: To expend for general improvements and development, including the building of Gardens, a sum equal to not less than fifteen per cent (15%) of the above purchase price, provided such sum, together with a like amount of all previous plot sales made by the Company, shall not already have been expended for such purposes subsequent to December 1, 1952." (See Exhibit 15-O).

Contrariwise, there is no evidence that these funds were received for the exclusive benefit of the burial lot owners or that there was a development fund of any kind established. Indeed, the most that can be said in petitioner's favor regarding this is that a mere bookkeeping entry was made to the effect that certain amounts were to be used in development of the cemetery. No dedicated and uninvadable development fund was established. Thus we inescapably must find

that petitioner had the unfettered right to use these funds as it desired upon receipt. The funds excluded from gross income by petitioner in its tax returns actually were gross income to it. Consequently, the Commissioner's deficiency assessment will be affirmed.

■ We are convinced that this case is squarely governed by the recent decision in Sherwood Memorial Gardens v. C.I.R. supra, which involved identical legal issues and at least one of the same parties. In *Sherwood*, a future development provision almost a twin to the clause in this case was contained in each burial lot sales contract. Regarding such a provision, the court in *Sherwood* held:

"Petitioner was obligated by the First Agreement only to deposit the designated sums in a separate bank account and to use the funds thus deposited for no other purpose than development of the cemetery. At best this provision created merely a contractual obligation, not a trust. But even if the agreement were a trust in form, where, as here, petitioner had wide discretion in use of the fund, with no definite obligation to make any particular improvements and with no necessary relationship between the amount of the fund and the development costs, and the fund was not for care of individual lots, petitioner was the primary beneficiary of the fund and it could not properly exclude that amount of the fund from its gross income." (350 F.2d 225, 230.)

As here, the taxpayer in *Sherwood* urged that its obligation to use these funds was definite and flowed from the engineering study made of the cemetery. The court found no indication that any of the purchasers knew or were informed of the plans, and no evidence was put forth that petitioner was not free to alter the plans at will. We must reach the same conclusion.

As noted, there is little if any distinction between *Sherwood* and the case we now have before us. It is obvious that petitioner had the unrestricted right to use all funds received from burial lot pur-

chasers and had no obligation to make specific improvements at any specific time. With reference to the grave markers, no purchase was necessary until final payment of the purchase price was tendered or a death occurred. These circumstances compel us to hold that petitioner was not entitled to exclude these amounts from gross income.

 Because of petitioner's persistence in urging that it has been taxed unconstitutionally, it becomes necessary briefly to dispose of this argument. Taxpayer urges that the analogy already discussed relative to real estate development is applicable. Suffice it to say that in the real estate cases, where exclusions for estimated development costs have been allowed, it was clearly established that specific improvements either were required by law or actually were made. These improvements included such items as streets, drives, sewer disposal systems and extension of gas and electric service lines. We should note that, if exclusions were taken for these items by taxpayers, that the expenditures thereafter *had not been made*, the Commissioner undoubtedly would have asserted a deficiency against those taxpayers as was done here.

Recently, in Willow Terrace Development Co. v. C.I.R., supra, this court allowed a taxpayer to allocate the cost of a water and sewerage system to the cost of homes in a newly developed subdivision. However, we noted that the test to be made was set forth in Estate of Collins v. C.I.R., 31 T.C. 238 (1958):

"'* * * We have concluded that petitioners constructed the sewerage system not only for the basic purpose but for the sole purpose of inducing and making possible the sale of lots * * *, that they did not retain full ownership and control of the sewerage system, and that they parted with material property rights therein for the benefit of the subdivision lots.'" (345 F.2d 933, 938, 939.)

As indicated by the test set forth in *Collins*, and indeed in all authorities noted, for an exclusion of estimated costs to be permitted, the funds must not only be held for the benefit of someone other than the taxpayer, but must also actually be used to that end. Here neither of these requirements has been met, and, accordingly, petitioner's argument that it has been unconstitutionally taxed upon gross receipts, instead of upon gross income, is without merit.

For the foregoing reasons and upon the basis of the authorities cited, the decision of the Tax Court is in part reversed and remanded, and in part is affirmed.

### ORDER DENYING MOTION FOR REHEARING

PER CURIAM:

The petition for rehearing in the above entitled and numbered cause is hereby denied; and no member of this panel and no Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, Rule 25(a), subpar. (b), the petition for rehearing en banc is denied.