**ROSE HILLS MEMORIAL PARK ASSOCIATION**
**v.**
**The UNITED STATES.**
**No. 376–66.**

United States Court of Claims.
July 14, 1972.

John H. Hall, Los Angeles, Cal., Atty. of Record, for plaintiff; Dana Latham, Austin H. Peck, Jr., William A. Long, and Latham & Watkins, Los Angeles, Cal., of counsel.

Philip R. Miller, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant; Ira Mark Bloom, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA and KUNZIG, Judges.

## OPINION

KASHIWA, Judge.*

The issue in this tax refund suit is whether plaintiff qualifies for exemption from the federal income tax under Section 501(c) (13) of the Internal Revenue Code of 1954.[1] For the reasons hereinafter to be discussed, we hold for the defendant and against the plaintiff.

Plaintiff was incorporated under the laws of the State of California in October, 1950, to operate as a non-profit cemetery corporation near Los Angeles, California. Detailed facts with relation to its organization, operation, control, and other relevant matters will be hereafter discussed as they relate to the issues raised by § 501(c) (13).

In early 1952, plaintiff applied for and received a ruling that it was exempt from income tax under § 101(5) of the Internal Revenue Code of 1939, which is the predecessor of § 501(c) (13) of the Internal Revenue Code of 1954, above quoted. Twelve years later, in August 1964, plaintiff received notice of the contemplated revocation of such exemption ruling. It protested this action but eventually filed on February 3, 1966, an income tax return for its fiscal year ended September 30, 1965, paying a tax of $237,264. The Internal Revenue Service did in fact revoke the exemption on March 10, 1966, retroactively effective to all years beginning after September 30, 1961. On September 23, 1966, plaintiff paid an assessed deficiency for 1965 of $6,031.

In its 1965 return, plaintiff deducted $568,247 as the cost of its sales of cemetery property. Included in that cost was $421,786 which plaintiff accrued as its obligation under a 1952 stock purchase agreement, the effect of which is at issue in this case. Briefly, the agreement provided for plaintiff's purchase of the stock of Bartolo Corporation, a for-profit California cemetery, in exchange for a percentage of gross sales. The IRS disallowed the $421,786 deduction and assessed a further deficiency of $201,959. On June 9, 1967, plaintiff filed an amended return in accordance with the Service's determination but deferred a portion of its tax by electing to report

---

* We have herein used material from the opinion of Trial Commissioner George Willi, though we reach a contrary result.

1. Internal Revenue Code of 1954 (26 U.S.C.) :
   "Sec. 501. Exemption from tax on corporations, certain trusts, etc."

   \*　　\*　　\*　　\*　　\*

   (c) List of exempt organizations.— The following organizations are referred to in subsection (a) :

   \*　　\*　　\*　　\*　　\*

   "(13) Cemetery companies owned and operated exclusively for the benefit of their members or which are not operated for profit; and any corporation chartered solely for burial purposes as a cemetery corporation and not permitted by its charter to engage in any business not necessarily incident to that purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual."

   \*　　\*　　\*　　\*　　\*

its income under the installment basis. Thus, the return showed an aggregate tax liability for 1965 of $245,219. Since plaintiff had already made payments of $237,264 and $6,031, it paid only $1,924 with the return. Following the Government's challenge to using the installment sales method, plaintiff paid an additional sum on September 1, 1967, but the Government has now refunded this amount with interest, conceding that taxpayer was entitled to elect the installment basis. Thus, there remains at issue the $245,219, which is covered by appropriate claims for refund. The filing of this suit was timely.

▇ Plaintiff's claim to the exemption from tax under § 501(c) (13) is based on the portion of that paragraph following the semicolon: [2]

> * * * any corporation chartered solely for burial purposes as a cemetery corporation and not permitted by its charter to engage in any business not necessarily incident to that purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual.

We shall first take up the question of benefit to private individuals. Whether any of plaintiff's net earnings inured to such private benefit depends on the effect given a stock purchase agreement plaintiff made on December 26, 1952, with the shareholders of the Bartolo Company and by which plaintiff acquired the greatest portion of its land.[3] Bartolo was the last of a series of corporations, with generally common ownership, that had been operating a for-profit cemetery business for many years. In 1951, it acquired some 1,800 acres of raw land for future expansion at a cost of $281,000. Additional purchases were made in 1951 and 1952 of a total of 257 acres for $390,000. When plaintiff was formed, all of its seven trustees were shareholders of Bartolo and members of a Los Angeles law firm which represented the shareholders. Though some outside trustees evidently were subsequently appointed, at all pertinent times the Bartolo shareholders and members of said law firm constituted a majority of plaintiff's trustees.

Under the agreement, all of Bartolo's outstanding stock was sold to plaintiff. In consideration therefor, plaintiff agreed to pay on the following basis: 30 percent of the gross selling price of gravesites sold from any property acquired from Bartolo; 10 percent of sales of mausoleums, niches, and crypts; 20 and 25 percent of sales of various underground crypts; 50 percent of rents and royalties received for the use of any of plaintiff's real property; and, on sales of real property under any other circumstances, during the first five years, 90 percent of the proceeds, during the following 10 years, 80 percent, and thereafter, 75 percent. There was no provision for a minimum annual payment and no stated interest rate. The agreement was to continue until all of the property was sold and fully paid for. It further provided that, upon consent of 51 percent in interest of the sellers, they could subordinate their claims to debts which plaintiff might incur to others and postpone or defer, in whole or in part, payment of amounts due them by plaintiff. The default clause recognized that the price to be paid was "in an amount not presently determinable and over a period, the duration of which cannot presently be determined." Consequently, in lieu of actual damages in the event of plaintiff's default, 51 percent of the sellers could immediately demand payment

2. Since plaintiff sells gravesites to the public on a commercially competitive basis and makes a profit thereby, it does not qualify under either of the exempt categories mentioned in the language preceding the semicolon. See Knollwood Memorial Gardens v. Commissioner, 46 T.C. 764, 784 (1966).

3. In separate transactions, plaintiff had earlier bought 61 acres and 9.6 acres from Bartolo for $2,055,306 and $563,740, respectively. Both of these purchases provided that the sale price was to be paid in ten years, and we see no reason to doubt that they were bona fide sales.

of any amounts then due and recover the Bartolo stock or the unsold land.

From 1952 through 1966, Bartolo and plaintiff embarked on a major development of the cemetery. Existing buildings were improved and new ones were built, including two chapels. Some 633 acres of the new land were cleared and graded to provide more gravesites. The cost of these projects was some $7,669,-000 with the land development accounting for over one-half. To finance these projects, Bartolo and plaintiff borrowed a total of $1,500,000 from two banks in 1954 and again in 1956. The former Bartolo shareholders (plaintiff's trustees) agreed to subordinate their rights under the 1952 agreement to these loans and any subsequently incurred debt to the banks to the extent of $2,500,000, with the understanding that the bank notes would not be due until December 1, 1969. In addition, they agreed that during the existence of the bank debt, plaintiff would limit its payments to the former Bartolo shareholders (hereinafter sometimes called transferors) under the 1952 agreement to only $120,000 per year and defer the remainder without interest.

By 1957, plaintiff began to feel a cash pinch. Its ambitious development program, together with the obligation to the transferors and its current operating expenses, outpaced its line of credit from the banks. Finally, in 1961, the transferors agreed to an amendment of the 1952 agreement which reduced the percentages of gross sales payable to them by approximately one-third. This was to be retroactive to 1958 and to continue until 1978. Thereafter, the original terms were substantially reinstated. The consideration for this amendment was the extension of the percentage-of-sales obligation to all lands acquired by plaintiff at any time after the 1952 agreement (about 210 acres by 1961). For the period from 1958 through 1967, the effect of the reduced percentages was to lower the accrued amount payable to the transferors by $2,577,000.

After 1961, plaintiff's cash position improved for a number of reasons. These included sales of pre-need funeral service debentures which totaled $6,700,-000 by September 30, 1967; the leveling out of pre-need sales, which reduced the necessity for additional funds; and deferral of payments to the transferors on reduced percentages. By 1968, plaintiff had over $7,000,000 in cash, and a net worth of $10,000,000.

From the inception of the 1952 agreement until September 30, 1968, the transferors received from plaintiff $5,500,000. As of that date, an additional $1,884,784 was due them but had been deferred because of the subordination agreements. Moreover, if the reduced percentages provided under the amendment to the agreement had not been in effect from 1958 to 1967, an additional $2,577,000 would have been owing.

Since the purchase involved some 2,154 acres and each acre could accommodate about 1,135 gravesites, there was involved about 2,445,000 salable gravesites. At the 1952 selling rate, 12,500 spaces per year, it was anticipated that the agreement would continue for about 200 years. And if the $160 price per lot remained constant, the sellers expected to receive about $615,000 per year or a total of $123,000,000. The Trial Commissioner found that the agreement constituted a sale with the purchase price of $6,951,-583 and that the payments, even though extending over an extremely long period, represented installments on the purchase price plus seven percent interest. Defendant, however, characterizes the transaction as an exchange of stock for an equity interest in plaintiff. Accordingly, defendant contends that to the extent that plaintiff has earnings in excess of capital, the payments to the transferors constitute corporate distributions of net earnings in violation of § 501(c) (13).

This issue is not uncommon to cemetery companies because frequently they are unable to get adequate financing for land acquisition. They have little credit

of their own and the land is undesirable collateral because of its limited use. Consequently, land is sometimes acquired by conveying to the seller a percentage interest in the cemetery's subsequent sales of the land. In its brief, the Government emphasizes that five Circuits and the Tax Court have now held that various forms of such indebtedness, payable by a share in the sales proceeds, issued to acquire land are really equity investments. Gardens of Faith, Inc. v. Commissioner of Internal Revenue, 345 F.2d 180 (4th Cir. 1965), aff'g per curiam 23 T.C.M. 1045 (1964), cert. denied, 382 U.S. 927, 86 S.Ct. 314, 15 L.Ed. 2d 340 (1965); Sherwood Memorial Gardens, Inc. (Tenn.) v. Commissioner of Internal Revenue, 350 F.2d 225 (7th Cir. 1965); Peterson v. Commissioner of Internal Revenue, 380 F.2d 1 (9th Cir. 1967); Jefferson Memorial Gardens, Inc. v. Commissioner of Internal Revenue, PH Memo T.C. ¶ 66,050 (1966), aff'd 390 F.2d 161 (5th Cir. 1968) (issue conceded on appeal); Hamilton Memorial Gardens, Inc. v. Commissioner of Internal Revenue, 394 F.2d 905 (6th Cir. 1968) (issue conceded on appeal), cert. denied, 393 U.S. 936, 89 S.Ct. 298, 21 L. Ed.2d 273 (1968); Knollwood Memorial Gardens v. Commissioner of Internal Revenue, 46 T.C. 764 (1966).

Historically, this type transaction won initial approval by the Board of Tax Appeals which twice allowed non-profit cemeteries to preserve their tax exempt status despite land acquisition agreements providing for payment from a percentage of lots sold. Commissioner of Internal Revenue v. Kensico Cemetery, 96 F.2d 594 (2d Cir. 1938), aff'g 35 B.T.A. 498 (1937), nonacquiesced in, 1937–1 Cum.Bull. 40; Forest Lawn Memorial Park Association, Inc., 45 B.T.A. 1091 (1941), nonacquiesced in, 1942–2 Cum.Bull. 25, withdrawn and acquiesced in, 1946–2 Cum.Bull. 2, withdrawn and nonacquiesced in, 1960–2 Cum.Bull. 8. As is evident from the above citations, the Internal Revenue Service had great difficulty in responding to these cases. This is understandable, because at the time when these cases arose, the large commercial cemetery industry was just developing. Subsequently, it became apparent to the Government that investors could improperly take advantage of the tremendous profit potential in the sale of such small lots as gravesites.

Later cases have usually involved for-profit cemeteries, but the basic percentage-of-sales agreement is still the source of the controversy. For example, in *Sherwood Memorial Gardens, supra,* the plaintiff cemetery was a newly organized for-profit corporation that issued 1,000 "certificates of indebtedness" to two non-shareholders (the wife of the 99 percent shareholder and an unrelated attorney) in exchange for their transfer of land and $30,000 cash to develop the land into a cemetery. The certificate holders were entitled to 25 percent of the gross sale price of the land for 15 years. The cemetery deducted the amount it paid to certificate holders as the cost of the land sold, and this was challenged as being distributions of equity capital.

Despite the fact that the certificate holders were not shareholders, the Tax Court characterized the transfers as contributions to equity capital, citing Brown Shoe Co. v. Commissioner of Internal Revenue, 339 U.S. 583, 589, 70 S.Ct. 820, 94 L.Ed. 1081 (1950). The petitioner contended that this was error because (1) the 25 percent interest existed regardless of net income, (2) the interest terminated after 15 years, (3) the certificate holders could not vote or manage the cemetery, and (4) they shared equally with creditors in the event of insolvency. The Seventh Circuit, however, agreed with the Tax Court. It found two of the classic elements of debt lacking: interest and fixed principal amount. Moreover, it approved of the Tax Court's reliance on the following factors to support the decision: (1) thin capitalization of the cemetery (60–1), (2) the speculative nature of the enterprise, (3) the suspicion that the land-share method, usually employed by non-profit cemeteries, was prompted by a tax

avoidance motive, and (4) the obvious tax avoidance gained by increasing the cemetery's basis in the lots and allowing capital gains treatment to the certificate holders.

This same arrangement was considered, from the certificate holders' point of view, in Peterson v. Commissioner of Internal Revenue, 380 F.2d 1 (9th Cir. 1967). Here, the facts presented an even more flagrant situation. The newly formed corporation issued debt certificates to its controlling shareholders who were entitled to 20 percent of gross sales of all land sold as cemetery lots. The corporation had been initially capitalized at $60, and the land (10 acres) was transferred with a cost basis to the holders of $2,500. The court affirmed the Tax Court's conclusion that an equity, not debt, interest was created because the certificates did not (1) guarantee payment, (2) provide for interest, (3) fix a principal amount, or (4) fix a set maturity date.

Of these recent cases, only *Knollwood Memorial Gardens* involved a tax-exempt corporation, and as plaintiff points out, it was the first case to deny the § 501(c) (13) exemption on the basis of a finding that the percentage-of-sales agreement constituted an equity interest in the corporation. By virtue of this, plaintiff seeks to distinguish itself from the cases which involved taxable cemeteries. However, we do not believe that this difference has any effect on the question of whether or not there was an equity interest. The statutory test prohibits the exemption whenever profits inure to the benefit of any "private shareholder *or individual*" (emphasis added). Indeed, in *Knollwood,* the Tax Court has already reached this conclusion:

> * * * we do not see any meaningful or convincing difference between equity interests owned by non-stockholders in a thinly capitalized stock corporation [as in *Sherwood Memorial Gardens*] and similar interests owned by individuals who contribute to non-stock corporations [as in

*Knollwood*] in return for such interests.

> * * * * * *

The statute thus specifically recognizes that corporate profits may wind up in the hands of non-stockholders, and whenever this happens, unless the corporation qualifies otherwise under the section, exemption is denied. We think the exemption should be denied in the case of non-stock membership corporations as well as in the case of stock corporations wherever the facts disclose that individuals share in the corporate profits because of equity interests. The net earnings of Knollwood's operation cannot be properly computed by first deducting payments to the landshare holders because those payments were not payments for the purchase price of land. Thus the distributions by whatever name called are of net earnings. [46 T.C. at 786].

We feel that the principles applied in the for-profit cemetery cases apply equally well to our consideration, in this case, of the equity interest question.

In *Knollwood,* the Tax Court considered a transfer similar to that involved in this case. The cemetery corporation acquired the land plus the seller's obligation to develop part of it into a cemetery. In exchange, it agreed to pay 20 percent of the sale proceeds of gravesites, the agreement to continue for 20 years after the last lot was sold. Just as in the instant case, the "seller" was one of the organizers of the cemetery company. In holding that the purported debt was really an equity interest, the court used many of the tests for indebtedness which had been previously applied to for-profit cemetery cases:

> Despite the fact that the land purchase agreement which created the interests of the landshare holders is couched in terms of purchase and sale, and in form appears to make the transferor of the land a creditor, virtually none of the elements of a true debt are present. There was no unconditional promise to pay; payment was

contingent upon future sales by the alleged "debtor." There was no fixed date of maturity; petitioner's obligation continued for an undeterminable period of time. There was no fixed amount of principal obligation; the amount ultimately to be received by the alleged "creditors" depended upon the number of lots sold. Even if the total number of lots to be carved out of the 20 acres were accurately determinable in advance and it be assumed that all of these lots would be sold, the ultimate amount to be received by the landshare holders would not be determinable since the amount is also dependent upon the price at which lots are sold, a factor which might vary over the future years. Furthermore, since there was no fixed principal amount owed, there was no interest payable. We recognize that a sale may be made and the consideration therefor may be based on a percentage of the resale price, but here on the evidence of record we can only conclude that no such transaction took place. [46 T.C. at 780–781, footnote omitted].

We believe that the Tax Court's objections can be made just as forcefully in this case. The substance of this transaction resembles an equity interest because all the traditional elements of a valid debt are missing. See Sayles Finishing Plants, Inc. v. United States, 399 F.2d 214, 218, 185 Ct.Cl. 196, 203 (1968), quoting from Gilbert v. Commissioner of Internal Revenue, 248 F.2d 399, 402 (2d Cir. 1957). (1) There was no unqualified obligation on plaintiff to pay because the installments depended on the sale of gravesites. (2) There was no maturity date because the obligation was to continue until all lots were sold. As stated above, by virtue of a 1961 amendment to the agreement, the obligation to pay a percentage of the sale price was extended to all contiguous property acquired by plaintiff at any time after the 1952 agreement. (3) There was no sum certain because the market price of gravesites could change. Indeed, the evidence showed that by

1968 lots were selling at $243 each, a 52 percent increase over their 1952 price and a 125 percent increase over their 1947 price (see finding 57). (4) There was no stated interest rate. (5) There was no minimum annual payment. (6) There was no right to share with general creditors in the assets because subsequent to the agreement the former Bartolo shareholders exercised their discretion to subordinate their claim to other debts. (7) In addition, there was no paid-in capitalization to the business. It was formed specifically to be the recipient of land, most of which had been acquired by Bartolo only a year or so before. (8) And lastly, the transferors had complete control over plaintiff's operations because they constituted its trustees. Therefore, they could determine how much was paid on the purported "debt." This control is generally inconsistent with a true debtor-creditor relationship. P. M. Finance Corp. v. Commissioner of Internal Revenue, 302 F.2d 786, 789 (3d Cir. 1962); *Knollwood Memorial Gardens, supra,* 46 T.C. at 782. By themselves, each of these factors might be acceptable in a valid debt instrument, but taken together, they are overwhelmingly persuasive that this transaction created an equity interest in plaintiff. See Sayles Finishing Plants, Inc. v. United States, *supra;* American Processing & Sales Co. v. United States, 371 F.2d 842, 178 Ct.Cl. 353 (1967); Indian Lake Estates, Inc. v. Stewart, 448 F.2d 574, 578–579 (5th Cir. 1971).

Plaintiff, relying on Commissioner of Internal Revenue v. Brown, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965), argues that if a valid sale has occurred, the above-mentioned criteria for determining the degree of risk-shifting become inapplicable. In that case, the sale price was payable out of income generated by the business being sold, so there was no shifting of risk to the buyer, a charity. Despite this, the Supreme Court upheld the sale because of the good faith, arm's-length bargaining between the buyer and seller which resulted in a reasonable and fixed price payable over

a ten-year period. The sellers had definitely parted with property for a fixed price. In our case, however, we find these elements missing. There was no definite price at the time of the 1952 agreement, and there was no limiting period within which the amounts had to be paid. Indeed, the transferors' interest in plaintiff was to last as long as plaintiff was in the business of selling gravesites. Thus, there is no basis upon which to conclude that a valid sale occurred. This is quite different from *Brown* in which, "If the stipulated price was paid, the Brown family would forever lose all rights to the income and properties of the company." 380 U.S. at 569, 85 S.Ct. at 1165. We think that *Brown* presented a different factual context. Though we agree that shifting of risk is not a *sine qua non* to a sale, we believe that it becomes relevant in a situation like that before us. The transferors entered into a bona fide agreement, but the terms of the agreement left them with an equity interest in plaintiff. Similarly, our decision in Union Bank v. United States, 285 F.2d 126, 152 Ct.Cl. 426 (1961), is distinguishable because it involved a definite purchase price which was due at the end of a ten-year period.

The disparity between the amounts involved herein further compels the result we reach. In *Knollwood, supra,* the landshare holders' total investment for land and improvements was $13,520, and the potential return was more than $200,-000—14 times their investment. On this fact, the Tax Court made the following conclusion:

> When, as here, the alleged "purchase price" bears no reasonable relationship to the fair market value of the assets conveyed, it is stretching normal definition beyond its breaking point to regard the transaction as a sale. The transaction was a contribution to capital placed at the risk of the business, and as such no debt was created; payments to landshare holders, "investors" in the cemetery enterprise, were distributions with respect to their re-

spective proprietary interests. [46 T.C. at 783].

Similarly, here the property was worth some $10,000,000 at the time of the transfer, and the transferors expected to receive more than $123,000,000—12 times their investment. To support its contention that a sale occurred, plaintiff emphasizes the trial commissioner's finding that the present value, in 1952, of the anticipated payments was only $6,951,-583, which is less than the property's fair market value at the time. Therefore, it says, the gross disparity between purchase price and fair market value present in *Knollwood* does not exist. But we do not attach the same significance to present value as does plaintiff. Of far more importance is the total payout which the former Bartolo shareholders would receive. This latter amount, which was the focus of the Tax Court's attention in *Knollwood,* could considerably exceed $123,000,000 because of the previously mentioned 52 percent rise in the market price of the lots, and we believe that this is indicative of an equity interest. The increase in market value of the gravesites in itself shows the weakness of plaintiff's sale argument. If the payout is characterized as part payment of principal and part interest for the credit extended, the sum of which is $123,000,000, then an increase in the sale price would lead to an earlier satisfaction of the debt. But this is not the case here. When the market price rose to $243 per lot, the total potential payments under the agreement rose to nearly $187,000,000. Thus, the payments would continue long after the "purchase price" would have been satisfied. This situation can only be described as participation in net earnings.

We do not mean, by our decision today, to hold that the percentage-of-sales agreement is, *per se*, a violation of § 501 (c) (13). See Rose Hills Memorial Park, Inc. v. Commissioner, 23 T.C.M. 1434 (1964) (an unrelated Connecticut corporation) and Washington Park Cemetery Assn., Inc. v. Commissioner, 22 T.C.M. 1345 (1963). We do believe,

however, that the *Kensico* and *Forest Lawn* cases, *supra,* have been considerably weakened by subsequent cases. We only hold that, on the basis of the situation before us, a contribution to capital was made instead of a sale and consequently net earnings of the corporation wound up in individuals' hands in violation of § 501(c) (13).

Another issue raised relates to the basis to plaintiff of the land it acquired on the liquidation of Bartolo. Plaintiff contends, consistent with its sale theory, that it is entitled to a basis in the assets equal to its cost of the Bartolo stock acquired in the 1952 agreement. It does not contend that this result is governed by § 334(b) (2) [4] because the Bartolo liquidation did not occur within the two-year period of § 334(b) (2) (A) (ii). Rather plaintiff seeks to have us apply the doctrine of Kimball-Diamond Milling Co. v. Commissioner of Internal Revenue, 10 T.C. 7 (1948), aff'd 187 F.2d 718 (5th Cir. 1951), cert. denied, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1951), to achieve the same result. Plaintiff reminds us that we have previously held that the *Kimball-Diamond* doctrine has not been pre-empted by enactment of § 334(b) (2). American Potash & Chemical Corp. v. United States, 399 F.2d 194, 206–209, 185 Ct.Cl. 161, 179–186 (1968), rehearing granted and case remanded, 185 Ct. Cl. 186, 402 F.2d 1000 (1968).

■■ The purpose of § 334(b) (2) and the *Kimball-Diamond* doctrine is to treat a taxpayer as if it had bought assets directly when direct ownership is the objective and when it can only be achieved by purchasing the owner-corporation's stock and then liquidating the corporation. *American Potash, supra,* 399 F.2d 194, 185 Ct.Cl. at 180–181. On the facts before us, we have found that the transfer was of an equity interest and did not constitute a sale. Furthermore, we are not certain that plaintiff's objective was to own the land directly. The fact of Bartolo's existence did not impair the operations of plaintiff or its payments to the transferors. And it would presumably have continued to operate Bartolo as a subsidiary but for the repeal of the California law imposing a tax on the liquidation. This being the case, we are not presented with a situation in which we must consider whether to apply the *Kimball-Diamond* rationale.

■ As plaintiff's trustees, the former Bartolo shareholders made a contribution to the capital of plaintiff when they transferred their stock in exchange for the equity interest. Therefore, plaintiff's basis in the stock was a carryover from the former shareholders under § 113(a) (8) of the 1939 Code.[5] See *Knollwood, supra,* 46 T.C. at 791, n. 15.

---

4. (2) *Exception.*—If property is received by a corporation in a distribution in complete liquidation of another corporation (within the meaning of section 332(b)), and if—

"(A) the distribution is pursuant to a plan of liquidation adopted—

"(i) on or after June 22, 1954, and

"(ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction) ; and

"(B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined

in paragraph (3)) during a 12-month period beginning with the earlier of—

"(i) the date of the first acquisition by purchase of such stock, or

"(ii) if any of such stock was acquired in an acquisition which is a purchase within the meaning of the second sentence of paragraph (3), the date on which the distributee is first considered under section 318(a) as owning stock owned by the corporation from which such acquisition was made, then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made."

5. "If the property was acquired after December 31, 1920, by a corporation—
* * * * *
"(B) as paid-in surplus or as a contribution to capital, then the basis shall

Thereafter, when Bartolo was liquidated, plaintiff succeeded to Bartolo's basis in the land under § 334(b) (1).

Accordingly, the petition will be dismissed.

be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made."